[Civ. No. 65231. Second Dist., Div. One. Mar. 29, 1984.]

STANTON S. KIEFFER, et al., Plaintiffs and Respondents, v.
S. S. SPENCER, as City Clerk, etc., et al., Defendants and Appellants;
CITY OF SAN GABRIEL, Real Party in Interest and Appellant.

[Civ. No. 65232. Second Dist., Div. One. Mar. 29, 1984.]

VON VINE et al., Plaintiffs and Respondents, v.
MARK M. UYEDA, as City Finance Director, etc., et al.,
Defendants and Appellants;
CITY OF SAN GABRIEL, Real Party in Interest and Appellant.

COUNSEL

Graham A. Ritchie, City Attorney, Simmons, Ritchie, Segal & Stark and Clausen, Harris & Campbell, for Defendants and Appellants and for Real Party in Interest and Appellant.

Mantalica & Treadwell, Mark A. Treadwell and Larry Nathenson for Plaintiffs and Respondents.

## OPINION

**HANSON (Thaxton), J.**—Consolidated appeals taken from judgments rendered below directing the issuance of peremptory writs of mandate in favor of petitioners.

Petitioners Stanton S. Kieffer and Karen L. Kieffer, doing business as Quick Silver Video Games (hereinafter referred to as petitioner Keiffer), sought a writ of mandate directing certain officials of the City of San Gabriel to issue petitioner a business license for operating a videogames arcade. Named as respondents were S. S. Spencer, city clerk, and I. Y. Crowe, license clerk, City of San Gabriel.

Petitioner Von Vine, doing business as Satellite Entertainment Centre (and hereinafter referred to as petitioner Vine) and California Automatic Industries, doing business as Action Automatic, sought a similar writ of mandate in a separate action. Named as respondents were Mark M. Uyeda, city finance director, S. S. Spencer, city clerk, and I. Y. Crowe, license clerk. In both actions the Real Party in Interest was the City of San Gabriel (hereinafter RPI or City).

The cases were consolidated below for hearing. Petitioners had not only sought extraordinary relief, but damages. The trial court only granted petitioners extraordinary relief, severing the monetary issues. City has appealed from the judgments granting petitioners relief. This court denied a stay of execution of the judgments, pending appeal. We affirm the judgments.

### FACTS

■ We summarize in some detail the factual background of this dispute, mindful of the appropriate standard of appellate review. That standard compels us to presume that the judgments rendered below were correct and to

assess those judgments on appeal in the light most favorable to upholding them. (6 Witkin, Cal. Procedure (2d ed. 1971) § 235, p. 4226.)

On April 22, 1981, petitioner Vine made an application to City for a business license to operate a videogame arcade at 625 Valley Boulevard, San Gabriel. At the same time, he applied for a permit for each of 18 video games to be installed in the arcade. On June 26, 1981, petitioner Kieffer made a similar application for a business license to operate a videogames arcade at 1381 East Las Tunas Drive, San Gabriel, and for permits for 16 games. Petitioner Vine paid $1,857 in application fees, and petitioner Kieffer, $877.

Petitioners' applications for the permits to operate videogames were governed by section 5-3.03 of the San Gabriel Municipal Code, which provides that: "No person shall place, install, keep, maintain, conduct, carry on, permit or allow the operation, maintenance, conduct or carrying on of any game of skill and science, unless that person is the holder of a valid and unexpired permit in full force and effect issued pursuant to the provisions of this chapter."

Section 5-3.07 of the San Gabriel Municipal Code requires that permit applications for games of skill and science be reviewed by the City's games advisory committee, which recommends granting or denying the permit to the city council. If no objection or appeal is filed concerning the recommendations of the games advisory committee, its recommendation becomes final without further action by the city council. However, if an objection or appeal is filed, the city council is required to conduct a public hearing concerning the application, in accordance with section 5-3.08 of the San Gabriel Municipal Code.

Petitioners alleged that at the time they submitted their applications and paid their fees, they sought the advice of representatives of City concerning the appropriate procedures to be taken in obtaining City approval. City officials advised them that no action would be taken on their applications *until* they had actually installed their machines in the locations in which they were to be operated. Petitioners were told that the City police department was required to inspect the machines by the governing ordinance, and that such inspection could not be made unless the machines were in place and operational. Petitioners were assured that the police department inspection was routine; that the applications were approved unless the inspection revealed that a game contained a specific, identifiable hazard, in which case petitioners would be given the opportunity to make necessary corrections. Petitioners were also told that the governing ordinance required approval by the games advisory committee, which consisted of the chief of police,

the city attorney and city administrator. Approval by this committee was described as a formality, forthcoming upon inspection by the police department, and that approval would ordinarily be given and the licenses issued.

Relying on these representations by City officials, petitioners incurred substantial expense in setting up their arcades, each investing over $50,000, much of which was spent acquiring and installing the videogames. Petitioner Kieffer encumbered his family residence to make the investment required. The police department made the required inspections at both arcades. Petitioners' applications were submitted to the games advisory committee, which was required by the governing ordinance to take action within thirty days after the submission of the applications. On July 8, 1981, the games advisory committee unanimously approved the applications. Petitioners had in fact been operating their arcades for some weeks with City approval, at the time the formal approval was given by the committee.

Section 5-3.07, which provides for objections and appeals concerning the decisions of the games advisory committee, requires that such objections or appeals be taken within 10 days after the committee's decision. Petitioners were told of committee approval on July 9, 1981, and were also advised that the decision approving issuance of the permits would be published in a local newspaper on July 15, 1981, to give the public an opportunity to file any objections or appeals. Publication did not in fact occur until July 23, 1981.

On July 31, 1981, four objections—two for each application—were filed with the city council. The city counsel scheduled a hearing of the matter for August 4, 1981. At this point, the matter was brought to the attention of City Attorney Ritchie, also counsel for RPI on this appeal. City Attorney Ritchie wrote a memorandum to City Administrator Clute, in which he stated: "Briefly, as I understand the situation, the Finance Department was previously taking applications for game machine permits and submitting them to the Committee for approval with pictures of the machines attached. The application (*sic*) was then advised that he should not install the machines until they had been approved and a permit issued. Then Chief Tutich (San Gabriel City Chief of Police) determined that he would not approve the machines in this fashion and required that the machines be installed prior to inspection and approval. The City code states that no such machines may be installed or maintained until the operator holds a valid permit for the machine. Faced with this dilemma, the finance department, without seeking any legal opinion, proceeded to advise applicants to install the machines (which evidently involves expensive electrical work and other remodelling work prior to installation) so that the chief of police could inspect them. I would not have approved such a procedure, since it is in direct violation

with the law. The finance department apparently also advised applicants that although permits were required for the operation of the machines, they could be operated prior to receiving the permits because they were routinely approved."

There is evidence in the record that the four objections made by citizens of San Gabriel were made because a certain City Councilman, Michael Falabrino, had become interested in the situation, and wished to cause denial of the permits. The objections were of similar wording, wording that admittedly emanated from Falabrino and City Administrator Clute. Depositions of the four citizens who made the objections makes clear that their cooperation in this matter was actively sought by the City; three of the objectors did not even know anything about the business locations to which they objected. At the city council meeting of August 4, 1981, hearing on the matter was continued to August 18.

City's police department, however, closed petitioners' arcades on August 5. And on August 18, 1981, the City Council proceeded to adopt an "emergency" ordinance, Ordinance No. 233 C.S., which placed a four-month moratorium on the establishment within City of any businesses in which more than three video games would be operated. The stated purpose of the moratorium was to protect the public health, safety, and welfare pending a study concerning the establishment of permanent regulations for video game arcades in City. At the August 18, 1981 hearing of the city council, the council proclaimed that by reason of enactment of the emergency ordinance, it had lost all authority to grant petitioners' applications since petitioners had sought permission to operate more than three video games at their respective locations. City council had been informed that it was economically infeasible for petitioners to operate their arcades with only three video games.

Petitioner Kieffer filed a petition for mandate, which was heard by Superior Court Judge Robert Weil. Weil indicated that he thought a grant of mandate appropriate, but continued the matter while petitioner Kieffer's petition was being amended. RPI promptly moved to disqualify Judge Weil, pursuant to Code of Civil Procedure section 170.6. The matter came on for hearing before Judge Leon Savitch, who remanded the matter to the San Gabriel City Council for hearing to determine the validity of the objections to petitioners' applications, so that there would be a complete administrative record concerning the issues involved.

Hearings were held before the city council on November 3 and November 17, 1981. On December 3, 1981, the city council issued Resolution No. 81-33, which declared that the objections were sustained and the applications

of petitioners were denied. At the November 17, 1981, meeting, however, the city council *approved the application of the San Gabriel Bowling Lanes for seven machines in one location*; no explanation was given for this action—taken while the moratorium was presumably still in effect.

Petitioners returned to the superior court with amended petitions, and the matter was set for hearing on January 22, 1982. On January 19, 1982, the City Council of San Gabriel passed a permanent ordinance, Ordinance No. 236 C.S., which required the issuance of a special use permit for the establishment of video game arcades in the City and set forth specific requirements for such special use permits to be issued. On January 22, 1982, petitioners obtained the peremptory writs of mandate, directing that they be allowed to conduct their video arcade businesses for the two-year period originally contemplated when the issuance of the permits was approved by the City in July 1981.

### The Trial Court's Statement of Intended Decision

One of the issues that was introduced into the lawsuit by RPI City was whether petitioners had properly sought relief under Code of Civil Procedure section 1085 or 1094.5. While the trial court was of the view that petitioners' writ application was more appropriately within the ambit of Code of Civil Procedure section 1085, the trial court admitted the administrative record which had been developed during this litigation, including all exhibits, and declared that he was familiar with them. Transcripts of the city council meetings were provided to this court by petitioners; we agreed to receive these transcripts prior to oral argument, and make them part of the appellate record. (Cal. Rules of Court, rules 12 and 41.)

The trial court stated that there was ample evidence in the record establishing a course of conduct by RPI which was "terribly unfortunate and totally inconsiderate of the rights of the petitioners . . . There has been a good deal of injustice committed by the City of San Gabriel with respect to these petitioners. . . ." The trial court found that certain City officials had, in an effort to thwart petitioners' business ventures, actively sought the objections made by the citizens, caused the adoption of the emergency ordinance and denial of permits to petitioners, subsequently, however, granting a permit to a bowling alley during the moratorium in a discriminatory manner. The trial court commented that even the permanent ordinance adopted shortly before hearing on the writs appeared to have been written to exclude the bowling alley machines.

The trial court specifically determined that the moratorium ordinance was "invalid." "I think that the moratorium ordinance is invalid in light of all

the history that has been recited and that the record establishes, most of which I have mentioned; that is, getting the petitioners to go ahead and install their machines, telling them the Games Committee approval would be routine, and that City Council approval is automatically routine unless there are protests, and so forth. I think there is no genuine emergency, other than the applications themselves, to cause the moratorium ordinance to go into effect. The fact that the City Attorney, Mr. Ritchie, the Chief of Police and the third member of the Games Committee had approved the ordinance within three or four weeks earlier, the moratorium ordinance, shows that to me."

## DISCUSSION

### I.

At no point in RPI's argument on appeal do they take issue with the material *facts* alleged by petitioners and alluded to at the hearing below by the trial court. RPI's appellate presentation has been made with skill and is replete with highly technical arguments seeking to persuade us that City has followed the letter of the law in dealing with petitioners.

The legal argument made with respect to the moratorium ordinance is a case in point: RPI relies on both section 36937 of the Government Code (which authorizes emergency ordinances "[f]or the immediate preservation of the public peace, health or safety . . .") and section 65858 of the Government Code (which provides for interim ordinances prohibiting certain kinds of land use when a study of broader implication is pending), as justification for RPI's enactment, on August 18, 1981, of the moratorium ordinance with which we are concerned in the case at bench.

RPI's argument misses the thrust of the trial court's ruling: the *basic* factual finding made below was that RPI had acted *in bad faith* insofar as the petitioners were concerned. There was substantial evidence supporting that finding. That being so, it matters very little whether Government Code sections exist authorizing emergency enactments and whether RPI did or did not follow them to the letter. The record inescapably establishes that RPI, instead of facing in the first instance the "dilemma" which had arisen with respect to petitioners, and arriving at fair resolution of the situation, has exacerbated the situation by engaging in administrative, legislative and legal conduct calculated to avoid responsibility for the substantial damages incurred by petitioners.

The legal arguments made in RPI's brief about the legality of the moratorium ordinance must be viewed in the context of a colloquy between City

Attorney Ritchie and the trial court with respect to the enactment of that ordinance. The trial court declared: "But it was clear to me from that exhibit and, as I stated before, from the whole picture that happened, that the purpose of the ordinance [moratorium], which may have three or four months later resulted in a new land use or new zoning operation, was to stop Mr. and Mrs. Kieffer and the Vine petitioners from opening, even though the permit had already been granted and approved by the Games Commission [*sic*]."

To which Mr. Ritchie, as an attorney and officer of the court, responded *"Yes, sir; that is correct."* This candid admission as to the purpose of the moratorium does not lend credence to appellate arguments claiming that RPI had a good faith reason for enacting the moratorium ordinance.

## II.

RPI seeks on appeal to persuade us, as it did persuade one superior court judge during this litigation, that petitioners are really pursuing relief under Code of Civil Procedure section 1094.5. RPI perceived advantage in litigating this matter under rules of administrative and appellate law which sometimes limit the power of the superior court in section 1094.5 matters to determining whether or not the administrative conclusions were supported by substantial evidence. Preparation of an administrative record has occasioned substantial delay for petitioners in obtaining their day in court. It has added little to the situation as it stood when petitioners first sought mandate, except to confirm petitioners' complaints of unjust treatment. We note that the California Supreme Court, confronted with a similar argument (in another context) in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111], rejected the introduction of technicalities into the area of extraordinary relief, and simply declared that petitioner in that matter was entitled to *mandamus,* whether traditional or administrative. We agree with the trial court that the situation at bench was properly pursued under section 1085, traditional mandamus. In view of our disposition, however, distinctions between traditional and administrative mandamus were immaterial in the case at bench.

## III.

Review of the trial court's remarks in their entirety leads us to the conclusion that the trial court was in effect applying the doctrine of equitable estoppel against City. We agree that the doctrine is applicable herein.

As was explained in *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 488 [91 Cal.Rptr. 23, 476 P.2d 423]: "The venerable doctrine of

equitable estoppel or estoppel in pais, . . . rests firmly upon a foundation of conscience and fair dealing, . . . [¶] As we pointed out in the recent case of *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, at p. 305 [61 Cal.Rptr. 661, 431 P.2d 245], 'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " With respect to (1), the *Mansell* opinion notes (at 3 C.3d 491), that "[e]specially in cases where the party to be estopped has made affirmative representations, as opposed to mere silence or acquiescence, knowledge of the true facts will be imputed to one who, in the circumstances of the case, ought to have such knowledge. [Citations]."

■ In the case at bench, RPI, through its officials, made certain affirmative representations to petitioners with respect to the establishment of the video arcades which should have been known to be untrue; the petitioners were counselled to act in violation of local law by the very persons presumably most knowledgeable about it. Since it was clear that by investing in expensive equipment and installation prior to formal approval petitioners were subjected to risk, RPI officials assured petitioners there really was no risk. This was intended to assuage any doubts petitioners may have had concerning the reasonableness of a rule that the machines must be in place *before* inspection by the police—a rule which did not then and does not now stand up under logical analysis. Petitioners were not in a position to do more than follow the procedures outlined for them. This they did to their injury.

*Mansell,* although it dealt with a complex number of issues concerning ownership of tidelands, clearly sets forth what considerations are extant when it is a governmental entity against which equitable estoppel is to be applied: "It is settled that '[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. [Citations].' . . . Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' [citation]. The tension between these twin principles makes up the doctrinal context in which concrete cases are decided. . . ." (*Id.,* at p. 493.) *Mansell* goes on to state that, "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to

justify any effect upon public interest or policy which would result from the raising of an estoppel." (3 Cal.3d 496-497.)

We note that game arcades are not new, and no strong public policy other than ordinary considerations of the general welfare needed to be implemented in City simply because the games were video games rather than traditional pinball machines or some other variety. The augmented record on appeal contains the admission of the chief of police that no trouble had been occasioned by the operations at petitioners' arcades during the time they were in business.

The record reveals a picture which offends ordinary concepts of fairness and justice. Petitioners were simply exercising their rights as citizens to commence and operate legitimate business entities within RPI. Insofar as the records show, they attempted to cooperate with officials of RPI. They relied, not only to their immediate detriment, but to the continuing detriment which invariably results when wrongdoing, whether intentional or not, is not faced squarely but is reinforced and ratified by continuous efforts to clothe it in legal respectibility. We conclude that RPI was estopped from depriving petitioners of the permits which had in effect been granted July 9, 1981, at the time RPI chose to pursue a course of conduct (for reasons not entirely clear) not only detrimental to petitioners but to public trust in local government.

The judgments are affirmed.

Spencer, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied April 17, 1984, and the petition of all the appellants for a hearing by the Supreme Court was denied May 23, 1984.