Ronald E. STEWART; John A. Gromala; John E. Donohue; Gerald R. Harland; Keith S. Humphreys; John D. Drake; Tom DuFour; Roger Sohnrey; Oklahoma Energy Investors; S & H Diversified; Sohnrey Bros., Plaintiffs–Appellees,

v.

James A. RAGLAND, Defendant–Appellant.

No. 89–16114.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 13, 1990.

Decided May 9, 1991.

As Amended June 13, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 30, 1991.

Jack R. Durland, Jr., Berry & Durland, Oklahoma City, Okl., for defendant-appellant.

John D. Barr, Marc C. Barulich, Barr, Newlan & Sinclair, Redding, Cal., for plaintiffs-appellees.

Before SNEED, SCHROEDER and CANBY, Circuit Judges.

SNEED, Circuit Judge:

This purports to be a securities fraud case based on a failed oil and gas venture. Defendant James Ragland, president of an Oklahoma oil and gas company, sold working interests in wells to the plaintiffs. Plaintiffs are all friends and associates of each other, many of whom have invested extensively in energy production.[1]

Each well was managed by an independent oil and gas operator, with plaintiffs retaining certain rights.[2] During the sales negotiations, one of the plaintiffs' law partners assured defendant over the phone and in writing that the interests would be exempt from classification as a security under the California Corporations Code.[3]

Plaintiffs asserted four causes of action: 1) selling unregistered securities in violation of the California Corporations Code; 2) fraudulent sale of securities in violation of the California Corporations Code; 3) fraudulent sale of securities in violation of the federal securities acts; and 4) common law fraud. The jury ruled in favor of each plaintiff on each of the counts and granted the same monetary award under each count. The district court increased the judgment to include prejudgment interest. Defendant appeals.[4] We reverse and remand for a new trial.

## I.

## SUBJECT MATTER JURISDICTION

The district court had subject matter jurisdiction over the federal securities act claims and pendent state law claims pursuant to 28 U.S.C. § 1331 (1988); 15 U.S.C. § 78aa (1988); and *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) (describing pendent claim jurisdiction). This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1291 (1988). If the federal claims were dismissed, we would still have subject matter jurisdiction through diversity of the parties. *See* 28 U.S.C. § 1332 (1988); Order of July 27, 1988, *Stewart v. American Int'l Oil & Gas Co.*, No. S–83–688 EJG, at 2–4 (E.D.Cal.) (final pretrial order) (defendants are Oklahoma residents; plaintiffs are California residents).

## II.

## IN PERSONAM JURISDICTION

■ Defendant claims that the district court lacked jurisdiction in personam.[5] He claims that under California law, when an out-of-state resident is served by publication, the court has jurisdiction only in rem—that is, only over defendant's property located in California.

Appellant's Excerpts of Record at CR 248.

1. Plaintiffs are individual attorneys, businessmen, and two investment partnerships (S & H Diversified and OEI) formed to invest in oil and gas. Some of the individual plaintiffs are also partners in S & H and OEI.

2. Defendant Ragland was an officer in the operating company that managed some of the wells.

3. The letter said:
   I reviewed the California Corporate Securities Laws with a view toward determining whether or not the acquisition of working interests in oil and gas wells under factual situation proposed would need to be qualified under the California Corporate Securities Law. It would appear that such sales would *not* have to be qualified ... inasmuch as our intent is that concurrent with the acquisition of our interest in any particular well, that interest would be pledged to Fidelity Bank, N.A. as security for the funds borrowed from that bank.

4. At the time of the original suit, defendant filed a separate suit for fraud and legal malpractice against those plaintiffs who are attorneys. Both cases were referred to the same trial judge who dismissed the fraud and malpractice suit against the plaintiff attorneys. The Ninth Circuit recently reversed and remanded for trial. *Stewart v. American Int'l Oil & Gas Co.*, No. 87–15075 (9th Cir. Oct. 18, 1989). The case is still pending.

5. Under the federal rules, a party must raise any objections to personal jurisdiction in its first motion under Rule 12. Fed.R.Civ.P. 12(h). If the court denies the motion, however, the party may proceed to trial on the merits without waiving the jurisdictional challenge. 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1351, at 243–44 & n. 13 (1990). Defendant claimed lack of personal jurisdiction in his first motion before the court and, therefore, did not waive the objection by defending on the merits.

██ Defendant cites California Civil Procedure Code sections 414.50 and 417, and several cases based on these sections, which provide that California courts may exercise only in rem jurisdiction when an out-of-state defendant is served by publication. These statutes, however, were repealed in 1969 as part of a major revision of the California rules of jurisdiction. The new statute allows service by publication on an out-of-state resident if a court is satisfied that the party to be served cannot be served in another manner with reasonable diligence. *See* Cal.Civ.Proc.Code § 415.50(a) (West Supp.1991) (service by publication permitted with court order); *Id.* § 415.50(d) (service on person outside state may be had in any manner provided by this article). The statute is broadly worded and specifically omits any reference to jurisdictional limitations based on the type of service.[6] Thus, the California legislature clearly has provided for in personam jurisdiction for an out-of-state plaintiff served by publication. *See Donel, Inc. v. Badalian,* 87 Cal.App.3d 327, 332–33, 150 Cal. Rptr. 855, 858 (1978); 2 B. Witkin, *California Procedure,* Jurisdiction §§ 91, 93 (1985) (under modern California rules, service by publication on an out-of-state plaintiff meets due process requirements and provides in personam jurisdiction).

Plaintiffs in this case complied with the statute's requirements for service by publication on an out-of-state defendant. The district court had in personam jurisdiction.

## III.

### VIOLATION OF THE FEDERAL SECURITIES LAW

██ The threshold issue is whether the trial court acted properly in deciding as a matter of law that the plaintiffs' interests in Oklahoma ventures were securities under the federal securities laws.[7] We hold that the trial court erred.

To fall within those laws the interests acquired by the plaintiffs must be "investment contracts" as defined by *SEC v. W.J. Howey Co.,* 328 U.S. 293, 297, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946). That case defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298–99, 66 S.Ct. at 1103. As in most cases, this case turns on the third element of that definition, the expectation of profits solely from the efforts of the promoter or a third party. Were "solely" to be given its literal meaning, it would be clear that the plaintiffs should not prevail on their federal securities claim. We have not defined "solely" in that fashion, however. In *S.E.C. v. Glenn W. Turner Enters., Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38

---

6. When legislators delete language, we may assume that they intended to eliminate the effect of the previous wording. *See Palos Verdes Faculty Ass'n v. Palos Verdes Peninsula Unified School Dist.,* 21 Cal.3d 650, 659, 580 P.2d 1155, 1159, 147 Cal.Rptr. 359, 363 (1978); *cf. West Coast Truck Lines v. Arcata Comm. Recycling,* 846 F.2d 1239, 1244 (9th Cir.1988) (when certain statutes contain a requirement and others do not, Congress must have intended both the inclusion and the exclusion of the requirement in the respective statutes), *cert. denied,* 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988).

7. Section 2(1) of the Securities Act of 1933 provides:

The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights ... or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 15 U.S.C. § 77b(1) (1988). Section 3(a)(10) of the Securities Exchange Act of 1934 follows the definition above almost precisely but with one exception.

The term "security" ... shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

*Id.* § 78c(a)(10). The courts have ruled these definitions to be functionally equivalent. *Tcherepnin v. Knight,* 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967); *Deutsch Energy Co. v. Mazur,* 813 F.2d 1567, 1569 n. 2 (9th Cir.1987).

L.Ed.2d 53 (1973), we only required that the efforts of the promoter or third party be "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 482.

■ The refinement this court fashioned in *Glenn W. Turner Enters., Inc.* is itself subject to qualification. To illustrate, one who induces several others to enter into an ordinary partnership to engage in a certain commercial enterprise, in which the inducing partner is also to be the managing partner, has not sold an "investment contract" because all partners have ample powers to control and direct the activities of the one who organized the venture. Each partner is equally involved and equally at risk. To stretch "solely" to embrace the efforts of the managing partner in this example would be to mock the ordinary meaning of language.

This court has recognized this qualification in *Deutsch Energy Co. v. Mazur,* 813 F.2d 1567 (9th Cir.1987). It found the third element of *Howey* absent in a situation it described as follows:

> The undisputed facts in the present case are as follows: the Deutsches, who are California residents, own and operate a convalescent hospital as their primary business. Jaime Deutsch, the father, also owns and operates retirement hotels adjacent to the convalescent hospital. Mark Deutsch, the son, inspected the oil well sites before the agreements were executed. The Deutsches' previous investments include a limited partnership organized to drill and operate gas wells in Ohio. Furthermore, they retained legal counsel who was present for the latter stages of the negotiations with NCEC regarding the purchase agreements.
>
> While one may surmise from these facts that neither of the Deutsches possesses the expertise to drill and complete the oil wells personally, it does not follow that they are "inexperienced and un-

knowledgeable members of the general public." Their general business expertise arises from other sophisticated business transactions. They clearly know how to read financial statements and are familiar with the use of experts such as accountants, attorneys, and geologists. Although it appears to be an open question whether sophistication in one field of business will always transfer to another field, we find that the Deutsches' claim of unsophistication is unsupported and raises no genuine issues of material fact given their level of general business expertise.

> · · · · ·

> *Based on undisputed facts, the transaction entered into by DEC and NCEC did not constitute an investment contract because, as possessors of significant managerial powers and a high degree of business acumen, the partners of DEC could not rightfully expect their profits to be derived solely from the efforts of individuals other than themselves.* The district court, therefore, correctly granted summary judgment to NCEC because no genuine issues of material fact exist as to whether the third element of *Howey* is absent.

*Id.* at 1570 (emphasis added) (citation omitted).[8]

■ There is no question in this case about the level of sophistication of each of the plaintiffs. Plaintiffs Stewart, Donohue, DuFour, Harland, and Humphreys acknowledged it in the preamble to their partnership agreement establishing Oklahoma Energy Investors in which they stated: "The parties, all of whom are knowledgeable in investment in oil and gas wells, have for some time, been partners and now wish to formalize the details of their partnership agreement."[9] There is in the record no contradiction of this representation. Plaintiff Gromala prior to this transaction had purchased ten oil and gas wells and served as a director of the Bank of

---

8. NCEC (Mazur, et al.) sold oil well sites to DEC (the Deutsches) to be operated by Sand Dollar under an operating agreement to be signed by both parties under which DEC retained the "significant managerial powers." *Deutsch Energy Co.,* 813 F.2d at 1568.

9. For a further discussion of the plaintiffs' level of sophistication, see *infra* subpart IV(B).

Loleta. Plaintiff Drake served on the board of directors of Butte Savings and Loan. Finally, plaintiff Sohnrey operated a corporate ranching enterprise.

The determinative issue, therefore, is whether the managerial powers held by the plaintiffs are sufficient to preclude a finding of the third *Howey* requirement. Plaintiffs contend they are not and attempt to limit the lesson of *Deutsch* to instances in which the investor-speculator owns one hundred percent of the oil and gas interest being developed under an operating agreement. We reject that limitation. Even in *Deutsch* there were two individuals, Mark and Jaime Deutsch, who formed the general partnership, Deutsch Energy Company, which purchased the wells and well sites. Nor does *Deutsch* itself so limit its reach. In this case one of the investors was a general partnership, Oklahoma Energy Investors, which was formed by most of the plaintiffs and acquired working interests on behalf of the partners. To draw a line between a two person general partnership that owns one hundred percent of the working interest and a ten person general partnership that along with a few of the parties owns less than one hundred percent of the working interest invokes an improper focus of attention. The proper focus is upon the managerial powers retained by the non-operators in a given relationship.

These appear in the document that constitutes the charter of rights of the parties in a financially hazardous undertaking. The Model Form Operating Agreement, as revised in 1977, sets forth in detail the rights, duties, powers, and liabilities of the investors, designated as parties, and the driller of the wells, the operator.

The provisions material to the securities issue include Article III, specifying the interest of the parties, Article IV, entitling "Parties" to results of the title examinations of title to working interests, Article V, empowering two or more parties owning a majority interest based on ownership to remove the "Operator" and to secure a "Successor Operator," Article VI, establishing the right of the parties to have access to the contract area, drilling site, and all relevant documents pertaining to the operator's work, and to prevent the abandonment of wells that have produced and dry holes under circumstances that permit parties who wish to abandon to avoid further costs. Article VII specifies that the liabilities of each party are "several, not joint or collective" and that this liability never exceeds "its share of the costs of developing and operating the Contract Area." It also states that the parties do not intend to create a partnership or association. In keeping with this idea, Article VII provides how expenses and income are to be distributed in a manner that maintains the separateness of each party's interest.

Separateness has its limits, of course. In addition to the requirement of a majority in interest to remove the operator, Article VIII imposes certain restraints on surrender, renewals, extension of, or encumbrances on, leases. It also waives any right of partition of any undivided interest in the contract area. Finally, Articles IX and X give the operator the power to make certain elections under the tax laws of the United States and to settle damage claims not exceeding fifteen thousand dollars arising from operations.

A particularly significant set of rights appears in Article VI(B). Under that provision, any investor could decide that a well should be reworked, deepened, or plugged and call upon the other investors in that well to vote on whether such action should be taken. The other investors then would have a set period of time in which to respond to this call. If fewer than all of the investors in that well wished to take the action in question, the proposing investor could press for the consenting investors to take action anyway. If the action were ultimately taken, certain safeguards would come into play to protect the financial interests of the nonconsenting parties.

Obviously the structure of the operating agreement does not fall within the usual categories of securities governed by the

federal and state securities laws. It is a carefully crafted set of legal relationships between no more than thirty-two persons, as limited by Oklahoma law, to engage in a complex and financially risky undertaking to discover and produce oil and gas. Because of the presence of legal, as well as operational and geological, complexity and high risk, the knowledgeable and sophisticated investors are given several opportunities to control the extent of their profits or losses, not without some cost, of course, but sufficient to dictate sustained oversight of the operator's work.[10] We believe this places this case within the ambit of *Deutsch*. We hold that the interests of the plaintiffs are not securities under the federal securities laws.

Our normal hesitancy to reverse the ruling of a trial court on a close question of mixed fact and law, as is the securities issue in this case, is relieved in this instance because nowhere does it appear that the court gave close attention to the intricacies of the operating agreement in determining that the investment made by the plaintiffs-appellees was within the *Howey* rule. The testimony of Mr. Hood, a witness for the defendant-appellant, was quite general in his description of the rights of the investors. Reporter's Transcript at 677–80. No other analysis of a more detailed nature appears in the record.

## IV.

### SALE OF UNREGISTERED SECURITIES IN VIOLATION OF CALIFORNIA LAW

Although the defendant asserted that the interests are not securities under federal securities laws, he did not make a similar argument with respect to California securi-

ties laws. Rather, he stipulated that the interests are securities under California law but argued that they should be exempt from the California securities laws under certain provisions and that the plaintiffs should be estopped from raising the California securities law claims. Given the defendant's posture, we express no opinion concerning whether the interests are securities under California law or whether there are differences between the definition of a security under California law and federal law.

■ Under California law, it is unlawful for any party to sell securities unless the sale has been properly qualified by the state or is subject to one of the enumerated exemptions. *See* Cal.Corp.Code § 25110 (West 1977). A party who has purchased unregistered securities may sue for recision or, in certain cases, for damages. *Id.* § 25503. This is true even if there is no evidence of fraud.

### A. The Estoppel Defense

The jury found the defendant liable for selling unregistered securities under the California Code. The defendant claims that the judge gave the jury inadequate instructions on the defense of estoppel. Defendant had argued that plaintiffs were estopped from asserting any claims under the California Corporations Code because plaintiffs had assured him the transactions were exempt.

The judge gave the following instructions to the jurors on estoppel as an affirmative defense to all of the counts.

Estoppel means that plaintiffs cannot now complain of a condition that they knew about and went along with, where the defendant was not aware that plain-

---

**10.** In contrast, this court has found the possible presence of a security when the powers within the agreement were merely illusory. For example, *Koch v. Hankins* involved thirty-five different general partnerships, each of which owned a small portion of a farming tract. *Koch v. Hankins*, 928 F.2d 1471, 1472–73 (9th Cir. March 21, 1991) (reversing a grant of summary judgment). Although the tract was managed as a whole, the individual investors only exercised control within their own parcels. *Id.* at 1479–80. Given that the individual partners had no ability to control the whole enterprise and that each par-

cel was not viable on its own, the court found that the investors may have been so dependent on the unique entrepreneurial or managerial ability of the promoter or manager that they could not replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers. *See id.* at 1479–81; *see also Hocking v. Dubois*, 885 F.2d 1449, 1461–62 (9th Cir.1989) (en banc) (discussing dependence on unique entrepreneurial or managerial efforts), *cert. denied,* —— U.S. ——, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990).

tiffs objected to it, and had reason to expect that plaintiffs would tell the defendant if they disapproved. Plaintiff's silence alone will not create an estoppel; for estoppel to arise, silence must occur under such circumstances that would be reasonable for defendant to rely on it. Reporter's Transcript at 862–63.

■ Estoppel requires the following factors: 1) plaintiffs knew the facts; 2) defendant did not know the facts; 3) plaintiffs intended that the defendant act upon their conduct or defendant had a right to believe it was so intended; and 4) defendant relied upon the conduct to his injury. *TRW, Inc. v. FTC,* 647 F.2d 942, 950–51 (9th Cir.1981); *Kieffer v. Spencer,* 153 Cal. App.3d 954, 963, 200 Cal.Rptr. 755, 761 (1984). This test actually is more difficult to meet than the one outlined by the judge in his instructions. Specifically, the instructions did not require findings that the defendant did not know the facts and that the defendant relied upon the plaintiffs' conduct. In short, the only errors in the estoppel instruction were made in defendant's favor. The defendant has nothing to complain about.

### B. *The Statutory Exemptions*

Defendant next claims that the sales were exempt from the California Code under two separate provisions. He argues that the judge erred in failing to instruct the jury on his exemption defenses.

The California Code contains a registration exemption for oil and gas interests which are pledged to a bank as collateral. Cal.Corp.Code § 25102(j) (West Supp.1991). Defendant argues that the exemption should apply because plaintiffs told defendant they intended to pledge the interests to a bank.[11]

Defendant, in essence, suggests that the rule under section 25102(j) should be that the transaction is exempt if the buyer represents that the oil and gas interests will be pledged to a bank. The language of the statute, however, does not support this interpretation.

Section 25102(j) exempts the following transactions from the registration requirements:

> Any offer or sale of any certificate of interest or participation in an oil or gas title or lease ... if (1) [all purchasers are engaged primarily in the oil and gas industry], or (2) such security is concurrently hypothecated to a bank in the ordinary course of business to secure a loan made by such bank; provided each purchaser represents that it is purchasing for its own account for investment and not with a view to or for sale in connection with any distribution of the security.

Section 25102(j).

■ A representation from the buyer is enough when the issue is whether the purchaser bought the interest for its own account for investment purposes. On the issue of whether the interests are hypothecated to a bank, however, the statute requires that the interests be concurrently hypothecated. When certain statutory provisions contain a requirement and others do not, we should assume that the legislature intended both the inclusion and the exclusion of the requirement. *See West Coast Truck Lines, Inc. v. Arcata Community Recycling, Center, Inc.,* 846 F.2d 1239, 1244 (9th Cir.1988) (applying federal law), *cert. denied* 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). We conclude, therefore, that on the issue of hypothecation, the statute requires more than the buyer's representation. It requires that the interests actually be hypothecated. That was not done in this case. The exemption, therefore, does not apply, and the defendant was not entitled to any instruction on the point.

The Code also contains an exemption for sales to a small number of purchasers under certain circumstances. Cal.Corp.Code § 25102(f) (West Supp.1991). The exemption requires that all buyers either 1) had a preexisting business or personal relationship with the seller or 2) had the business or financial experience to protect their own interests or had professional advisors with adequate experience. *Id.* § 25102(f)(2).

---

**11.** In reality, the interests were never pledged. The parties disagree over whether the defendant knew they were not pledged.

The trial court refused to instruct the jury on this exemption in part on the grounds that defendant had failed to present sufficient evidence of either existing relationships with the seller or adequate experience. The trial court erred.

■■■ A defendant is entitled to an instruction concerning his theory of the case if it is supported by law and has some foundation in the evidence. *See Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1398 (9th Cir.1984), *cert. denied sub nom, National Football League v. Oakland Raiders, Ltd.,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). Failure to instruct on an appropriate theory of the case is a question of law which we review de novo. *See 999 v. C.I.T. Corp.,* 776 F.2d 866, 871 (9th Cir.1985).

■■■ There was ample evidence in this case to support the conclusion that the buyers had adequate business or financial experience to protect their investment. Plaintiffs Stewart, Donohue, DuFour, Harland, and Humphreys, as already pointed out, acknowledged in the OEI partnership agreement that they were all knowledgeable in oil and gas investments. In addition, DuFour testified that he had invested in four or five wells before this transaction. Harland testified that he had invested in thirty wells. Donahue, a managing partner of OEI and an individual plaintiff, testified that he had purchased twelve to fifteen oil and gas leases. Stewart, the other managing partner of OEI, testified that he had purchased one oil and gas lease previously and had invested in real estate and almond farming. Gromala, another individual plaintiff, had purchased ten oil and gas wells and had served as a director of the Bank of Loleta. Although Drake and the Sohnrey brothers did not testify, we do know that Drake served on the board of directors of Butte Savings and Loan and that Roger Sohnrey operated a corporate ranching enterprise. The record clearly contained enough evidence to allow the

jury to consider whether these interests were exempt from California's registration requirements.

■■■ The plaintiffs argue further that the defendant was not entitled to an instruction concerning a section 25102(f) exemption because the final pretrial order did not mention this exemption. The district court agreed with the plaintiffs on this point. We disagree.

The trial court instructed the plaintiffs to draft the final pretrial order in accordance with the pretrial conference. The proposed order gave the defendant an opportunity to raise any objections. In his objections, the defendant stated that the interests "may not be securities as defined by California Corporations Code in view of the fact that they may come within one or more of the exemptions." The trial court rejected defendant's objection on the ground that defendant, having failed to object to any of the earlier versions of the order which plaintiffs had shown him, could not object within the time limits established by the trial court's order.

■■■ A trial judge is given broad discretion in supervising the pretrial phase of the litigation, with a view towards sifting out those issues involving honest disputes of law or fact. *FDIC v. Glickman,* 450 F.2d 416, 419 (9th Cir.1971). In most circumstances, we are extremely reluctant to interfere with a trial court's management of a case at this stage. Under the facts of this case, however, we find that the trial court abused its discretion.

Although the order purportedly gave the defendant an opportunity to object, in reality, it was in the view of the trial court already too late. The defendant may have been justifiably confused about the moment at which an objection was necessary. Although the problem may have arisen by virtue of the defendant's not infrequent procrastination and lack of cooperation, we find that the overall interests of justice were not served by cutting off a potentially meritorious defense at this critical juncture.[12]

---

12. In their petition for rehearing, plaintiffs argue that section 25102(f), in its current form, was not adopted until November 1, 1981. Because the current section cannot be applied retroactively, plaintiffs argue that our holding is erroneous because most of the oil and gas interests in this case were acquired prior to November 1, 1981. *See Sherman v. Lloyd,* 181 Cal.

## V.

### COMMON LAW FRAUD

Under California law, a fraud action requires: 1) misrepresentation; 2) knowledge of the falsity of the representation; 3) intent to induce reliance; 4) justifiable reliance; and 5) damages. *See* 5 B. Witkin, *Summary of California Law*, Torts § 676, at 778 (9th ed. 1987). The defendant moved for a directed verdict and later for judgment notwithstanding the verdict on the ground that plaintiffs failed to present sufficient evidence of misrepresentations concerning each of the wells to each of the plaintiffs. The district court denied the motions. We disagree.

The case involved eight plaintiffs who purchased different combinations of eleven wells. Following is a summary of the evidence of misrepresentations made to each plaintiff concerning each well.

### A. *Oklahoma Energy Investors (OEI)*

OEI is a partnership composed of the following individuals: Donohue, Stewart, Burchett, Craig, DuFour, Harland, Humphreys, Nolta, Sullivan, and Sweeney.[13] The partnership bought interests in the following eight wells: Frazer, Hayes # 1, Keeton, Parker, Seago, Westfahl # 2, Brady, and Vickery.[14]

OEI purchased six of the wells, Frazer, Hayes # 1, Keeton, Parker, Seago, West-

fahl # 2, on October 21, 1981. The defendant concedes that the plaintiffs presented sufficient allegations of fraud concerning these six wells. Brief of Defendant in Support of Motion for Judgment Notwithstanding the Verdict and Motion for New Trial at 25–26, Stewart v. Ragland, (No. CIV–S–83–688) (E.D.Cal. April 28, 1989). OEI also purchased the Brady well in February of 1982 and the Vickery well in March of 1982. The defendant claims that the plaintiffs did not present sufficient evidence of misrepresentations concerning these wells.

Donohue and Stewart, the managing partners of OEI testified that the defendant told them the Brady well was an offset. According to Stewart, "this was supposed to be an example of an offset well, a whole lot of wells around it that have been producing years and years and years of known production." Reporter's Transcript at 112. Donohue also testified saying, "[m]y understanding it was an offset well." *Id.* at 53.

Plaintiffs failed to show, however, that the Brady is not an offset well of some kind. Plaintiff's witness, White, only testified that Brady is not a *direct* offset:

Q Okay. And was the Brady C–10 an offset well?

A If I could say the definition of a direct offset, no. The definition of a direct offset is if the commission, mean-

App.3d 693, 700 n. 4, 226 Cal.Rptr. 495, 499 n. 4 (1986). If plaintiffs are correct, then these interests may not qualify for an exemption from registration under section 25102(f).

This argument was not raised in the district court nor was it presented to this court in the briefs or during oral argument. Clearly, the issue has been waived. Because of our decision to reverse for a new trial, however, the plaintiffs may be able to present this argument to the district court if they wish. Since resolution of this issue turns on an interpretation of the pre–1981 section 25102(f), as well as a categorization of these interests under California law, we do not address the merits at this time. *See generally* H. Marsh & R. Volk, *Practice Under the California Securities Laws* § 4.02A[1][a] (rev. ed. 1983); *see also People v. Skelton,* 109 Cal.App.3d

691, 724, 167 Cal.Rptr. 636, 654 (1980); *Tomei v. Fairline Feeding Corp.,* 67 Cal.App.3d 398, 401, 137 Cal.Rptr. 656, 658 (1977).

**13.** Some of the partners, Harland, Donohue, and DuFour, also bought interests in various wells for themselves as individuals and have sued as individual plaintiffs. Three plaintiffs, Drake, Gromala, and Sohnrey Brothers were not OEI partners. Finally, plaintiff S & H diversified is a partnership separate from OEI. The two partners of S & H, Stewart and Humphreys, however, also are partners in OEI.

**14.** Although all of the wells have numbers after their names, we have omitted the numbers except where this case concerns more than one well with the same name.

ing the Oklahoma Corporation Commission, has allowed five acres or two-and-a-half acre drill sites, then the next adjacent five acres would be producing to be a direct offset. In the area of where the Brady was drilled there was similar production off, you know, had been there for many years, but not a direct offset. Reporter's Transcript at 235.

■ Plaintiffs' witness did not say that the Brady well was not an offset of any kind, but only that the Brady well was not a direct offset. In fact, he confirmed that there had been similar successful wells in the area for many years. Plaintiffs, therefore, failed to satisfy their burden of showing that the defendant gave any inaccurate information about the Brady well.[15]

■ The defendant also claims that plaintiffs did not present evidence of material misrepresentations made to OEI concerning the Vickery well. We disagree. The Vickery well had been drilled before but had been shut down because it was not producing in paying quantities. The current operators believed that the price of oil had risen sufficiently to make the well profitable. Stewart, a managing partner of OEI, testified that the defendant told him that when an operator shuts down a well, he records the method of closure. Using this information, future engineers can determine if a well can be reopened. The defendant then told Stewart that White, an engineer, had determined that the well could be reopened. Reporter's Transcript at 114–15.[16] White, however, testified that he did not and could not have told the defendant that the well could be reopened because he did not know how it had been closed. The well had been closed a long time ago, and records that old were too hard to find. Most important, the operators in those days did not always follow standard closure procedures, for example,

they sometimes threw excess equipment into the well before closure. Reporter's Transcript at 235–36. In fact, the operators never managed to reopen the Vickery well.

The plaintiffs presented sufficient evidence for the jury to find that the defendant made material misrepresentations to OEI concerning the Vickery well. In sum, the plaintiffs presented evidence of fraud concerning seven of the wells OEI bought but failed to present any sufficient evidence concerning the eighth.

### B. *Drake*

Drake bought interests in the Brady and Vickery wells in early 1982. Drake did not testify and he was not a partner in any of the partnership groups.

DuFour and Donohue did testify that Drake was present at a meeting that included the defendant, Donohue, DuFour, and Stewart in October of 1981. Reporter's Transcript at 274, 299. The district court ruled that Drake's presence at this meeting could be combined with the DuFour and Donohue testimony concerning misrepresentations at the meeting to find that the defendant had made misrepresentations to Drake. Reporter's Transcript at 393, 410–11.

The trial court was correct concerning the theory but erred in applying the facts. Plaintiffs' witnesses testified that during the September and October meetings, the parties discussed the initial slate of wells, Frazer, Hayes # 1, Keeton, Parker, Seago, and Westfahl # 2. There is no evidence of any discussion at all, let alone any misrepresentations, concerning the Brady and Vickery wells during the fall meetings.

The timing of the purchases also suggests that the issue of buying the Brady and Vickery wells did not arise during the fall meetings. All of the plaintiffs who

---

**15.** Stewart also alleged that the defendant overcharged OEI and other plaintiffs for the Brady well interests by including an inflated drilling cost. When the plaintiffs discovered the error, however, the defendant refunded the amount of the overcharge and the plaintiffs accepted the refunds. The plaintiffs thereby ratified any problems in the initial calculation of the purchase price. *See Bowmer v. H.C. Louis, Inc.,* 243 Cal.App.2d 501, 503, 52 Cal.Rptr. 436, 437 (1966)

(the right to rescind for fraud is lost if the injured party manifests intention to affirm the contract after discovery of the fraud); Restatement (Second) of Contracts § 380 (1981).

**16.** Donohue, the other managing partner of OEI, also testified that the defendant told him the Vickery well could be successfully reopened. Reporter's Transcript at 53–54.

purchased wells other than Brady and Vickery purchased them at various times prior to November of 1981. All of the plaintiffs who purchased the Brady and Vickery wells, however, purchased them in February and March of 1982. In short, there is simply no way to tie Drake to evidence of any misrepresentations concerning the wells that he purchased.

### C. *Roger Sohnrey as an Individual and Partner in Sohnrey Brothers*

Roger Sohnrey purchased an interest in the Brady well on behalf of the Sohnrey Brothers partnership. Neither Sohnrey brother is a member of OEI and neither one testified at the trial. The only evidence in the trial record concerning the Sohnreys and their investment came from Stewart:

> Q  Well, how did Roger Sohnrey find out about these investments?
>
> A  Roger Sohnrey probably, if I were to list the three closest friends I have, he would be in that list and he was familiar, on a social and close friendship basis that John and I had invested in Oklahoma oil wells and it came up in a social conversation and he asked to be put in touch with Mr. Ragland and he purchased some interests.

Reporter's Transcript at 159–60.

There is simply no evidence at all concerning what the defendant did or did not tell the Sohnreys about the Brady well. Even if there were some way to link the Sohnreys to statements the defendant made to other plaintiffs, the defendant did not make any actionable statements to other plaintiffs concerning the Brady well.[17]

### D. *DuFour*

DuFour was a member of the OEI partnership who also purchased interests for himself as an individual. He purchased interests in the Cheryl, Hayes # 1, and Hayes # 2 wells in July of 1981. DuFour sued on his own behalf concerning these individual interests.

DuFour did testify at trial. His only testimony concerning what the defendant told him about the wells, however, was the following: "Well, all of the investments that I was involved in were represented to me by Ragland to be excellent investments. I don't remember any specific conversation about a specific well." Reporter's Transcript at 276. DuFour also testified that he was present at the October meeting which included the defendant, Drake, DuFour, Stewart, and Donohue.

The trial court ruled that DuFour's presence at the October meeting could be combined with other testimony concerning misrepresentations at that meeting to find that the defendant had made misrepresentations to DuFour. Reporter's Transcript at 404–405. DuFour, however, made his purchases in July, several months before the October meeting. Any misrepresentations in October would be irrelevant to fraud in the inducement of these earlier purchases. Thus, there is no evidence of fraud concerning DuFour's individual purchases.

### E. *Donohue*

Donohue was a member of the OEI partnership who also purchased additional interests for himself as an individual. He bought the Cheryl, Hayes # 1, and Hayes # 2 wells in July of 1981. He also bought the Vickery well in March of 1982 and the Brady well in February of 1982. Donohue sued as an individual on these additional purchases.

██ Donohue testified that the defendant told him that the Cheryl, Hayes # 1, and Hayes # 2 wells would offset wells in the area that were already producing more than fifty barrels a day. Reporter's Transcript at 25–27. Donohue then testified that there were no wells in the vicinity of any of these wells producing at that level. *Id.* at 27. The jury could reasonably have found fraud as to these wells from this testimony. In addition, Donohue also testified that the defendant gave him false information concerning whether the Vickery well could be reopened.[18]

---

**17.** *See supra* subpart V(A).

**18.** *See supra* subpart V(A).

As we discussed before, however, none of the parties produced evidence of fraudulent statements concerning the Brady well.[19] Thus, Donohue presented evidence of fraudulent statements concerning four of the wells he purchased but not the fifth.

### F. S & H Diversified

S & H Diversified is a partnership composed of Stewart and Humphreys. Both Stewart and Humphreys are also partners in OEI. S & H purchased interests in the Cheryl well in August of 1981, the Brady well in February of 1982, and the Vickery well in March of 1982.

As we discussed in the OEI section, Stewart testified that the defendant gave him false information about whether the Vickery well could be reopened.[20] None of the witnesses, however, presented evidence sufficient to show fraud as to the Brady well.[21] Finally, the defendant has conceded that the plaintiffs presented sufficient allegations of fraud concerning the Cheryl well. Brief of Defendant in Support of Motion for Judgment Notwithstanding the Verdict and Motion for New Trial, Stewart v. Ragland at 26, (No. CIV–S–83–688) (E.D.Cal. April 28, 1989). Thus, we find that S & H presented sufficient evidence of fraudulent statements concerning the Vickery and Cheryl wells but not the Brady well.

### G. Harland

Harland was a partner in OEI who also purchased separate interests as an individual. Harland purchased the Hayes # 2 well in July of 1981; the Parker # 2, Westfahl # 1, and Cheryl wells in September of 1981; and the Brady well in February of 1982. He has sued on his own behalf concerning these additional interests.

Defendants have conceded that the plaintiffs alleged sufficient evidence of fraud concerning the Parker and Cheryl wells. As we have discussed, however, the evidence in the record is insufficient to show fraud concerning the Brady well.

In addition, there is no evidence in the record concerning false statements or omissions about the Westfahl # 1 well. Harland was the only plaintiff who purchased this well. His testimony does not include any evidence of fraud concerning this well. None of the other witnesses discussed misstatements as to this well either.

Finally, Harland did not present evidence of any false statements or omissions concerning the Hayes # 2 well. The only party who testified about false information concerning this well was Donohue. Although Donohue and Harland later became OEI partners, they each bought interests in the Hayes # 2 well long before the inception of OEI. Thus, these statements cannot be linked to Harland by virtue of his later partnership with Donohue.

Plaintiffs note that under California law, one who practices deceit with the intent to defraud a particular class is deemed to have intended to defraud every member of that class *who is misled by the deceit.* Cal.Civ.Code § 1711 (West 1985) (emphasis added). We see no evidence, however, that Harland ever received any of the information at issue, let alone was misled by it. Thus, this provision does not save Harland's case. In sum, Harland presented sufficient evidence of fraud concerning the Cheryl and Parker wells, but insufficient evidence concerning the Brady, Westfahl # 1, and Hayes # 2 wells.

### H. Gromala

Gromala was not a partner in OEI. He purchased an interest in the Cheryl well in August of 1981. The defendant conceded that plaintiffs presented sufficient allegations of fraud concerning the Cheryl well. Brief of Defendant in Support of Motion for Judgment Notwithstanding the Verdict and Motion for New Trial, Stewart v. Ragland at 26, (No. CIV–S–83–688) (E.D.Cal. April 28, 1989).

The defendant was clearly correct to concede this point as to Gromala. Gromala testified that when he purchased the Cheryl well in August, the defendant told him that the well was completed and currently

---

19. *See supra* subpart V(A).

20. Under California law, if one partner acting in a particular matter has information about the partnership's business, that knowledge may be imputed to the partnership as an entity. Cal. Corp.Code § 15012 (West 1977). Stewart's testimony, therefore, may be imputed to S & H.

21. *See supra* subpart V(A).

producing fifty barrels a day. Reporter's Transcript at 181–82. White later testified that the Cheryl well was not completed until December 17. Thus, Gromala clearly presented sufficient evidence of fraud.

### I. Summary of the Common Law Fraud Counts

As discussed above, plaintiffs failed to prove that the defendant made material false statements or omissions concerning each and every well to each and every relevant buyer. In the case of Drake, Sohnrey Brothers, and DuFour, these plaintiffs did not present sufficient evidence concerning any of their purchases. In the case of OEI, Donohue, S & H Diversified, and Harland, these plaintiffs presented sufficient evidence concerning some of their purchases but not others. Only Gromala sufficiently presented his case.

### VI.

### FRAUDULENT SALE OF SECURITIES UNDER THE CALIFORNIA CODE

■ Plaintiffs' final count concerned the fraudulent sale of securities under the California Corporations Code. The Code provides that it is unlawful to sell a security by means of a communication containing false statements or omissions. Cal.Corp. Code § 25401 (West 1977). Section 25401 applies to all sales of securities, regardless of whether they are exempt from the registration requirements. *See* 2 H. Ballantine & G. Sterling, *California Corporation Laws* §§ 446, 466.01 (R. Clark 4th ed. 1990).

Section 25401 requires evidence of fraudulent statements. As we have discussed above, the plaintiffs case concerning fraudulent statements is seriously lacking in a variety of areas. Although the defendant requested JNOV on the common law fraud count on the ground of insufficient evidence of fraud, he neglected to move for JNOV on the statutory fraud claim on these grounds.

■ We are reluctant to find that the defendant has procedurally defaulted with respect to this argument because to do so would uphold the entire jury verdict even though the evidence suggests that the misrepresentations did not affect all wells. Moreover, the errors in the case were numerous and substantial. We cannot know what the jury would have done if there had been no federal securities claim, if the judge had included proper instructions concerning exemptions from the California registration requirements, and if the court had eliminated the common law fraud claims where there was insufficient evidence. Where the errors in a case are so extensive, it would be improper to accept the verdicts in whole or in part. We therefore conclude that the entire case must be reversed and remanded for a new trial.

### VII.

### OFFSETS FOR INCOME

This holding eliminates the necessity to address the issue of income offsets in computing damages. Under the California statute, a purchaser of unregistered securities who still owns the security may recover "the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security." Cal.Corp.Code § 25501 (West 1977). Prior to trial, the district court ruled that the defendant should bear the burden of proving the income received. Order of July 27, 1988, *Stewart v. American Int'l Oil & Gas Co.*, No. S–83–688 EJG, at 3–4 (E.D.Cal.) (final pretrial order). The defendant did not dispute this burden allocation. *See* Objections to Pretrial Order, *Stewart v. American Int'l Oil & Gas Co.*, No. S–83–688 EJG (Aug. 3, 1988) (no objection mentioned on this point). The district court told the parties that after the trial, it would offset any judgment in the amount of income received if the evidence warranted. The court later denied the defendant's motion for income offsets.

We need not decide whether this denial by the district court was improper. Should the issue be relevant, the parties will have another opportunity to present their evidence at a new trial.

The judgment below is REVERSED and REMANDED for a new trial.