**Jack G. LARSEN, Plaintiff,**

v.

**LAURIEL INVESTMENTS, INC. et al., Defendants.**

**No. 00–CV–2280–PHX–PGR.**

United States District Court, D. Arizona.

Sept. 7, 2001.

Glen Roger Thompson, Nashville, TN, pro se.

Mark M. Deatherage, Edward Calvin Fuchs, Gallagher & Kennedy, PA, Phoenix, AZ, Karl Michael Tilleman, Steptoe & Johnson LLP, Phoenix, AZ, Jeffrey E. Grell, Leonard Street & Deinard, Minneapolis, MN, for Paul W. Floyd, III and James M. Floyd.

Don P. Martin, John Maston O'Neal, Quarles & Brady Streich Lang LLP, Phoenix, AZ, for Philip C. Galanis.

Miles N. Ruthberg, Jamie L. Wine, Peter W. Devereaux, Robert J. Malionek, Latham & Watkins, Los Angeles, CA, for Paul F. Clarke.

Miles N. Ruthberg, Jamie L. Wine, Peter W. Devereaux, Robert J. Malionek, Latham & Watkins, Los Angeles, CA, Richard J. Mooney, Latham & Watkins, San Francisco, CA, for Ernst & Young Caribbean Region Ltd.

Bryan F. Murphy, Edwin D. Fleming, James Michael Stipe, III, Burch & Crac-

chiolo, PA, Phoenix, AZ, for Jack G. Larsen, CPA.

## ORDER

ROSENBLATT, District Judge.

■ Pending before this Court are (1) defendant Paul Floyd's and James Floyd's Motion to Dismiss (Doc. 18–1); (2) defendants Standard Industrial Capital and Glen Roger Thompson's Motion to Dismiss (Doc. 61–1)[1]; (3) defendant Ernst & Young Carribean's Motion to Dismiss for lack of personal jurisdiction (Doc. 83–1); (4) defendant Ernst & Young Carribean's Motion to Dismiss for failure to state a claim (Doc. 84–1); defendant Galanis' Motion to dismiss for lack of personal jurisdiction (Doc. 87–1); (5) defendant Galanis' Motion to Dismiss plaintiff's First Amended Complaint for failure to state a proper racketeering claim (Doc. 88–1); (6) defendant Galanis' Motion for Protective Order (Doc. 43–1); (7) defendant Ernst & Young Carribean's Motion for Protective Order (Doc. 98–1); (8) plaintiff's Motion to Compel Ernst & Young Chartered Accountants to respond to discovery (Doc. 102–1); (9) plaintiff's Motion for Sanctions against Ernst & Young for failure to voluntarily provide discovery (Doc. 102–2); and (10) defendant Ernst & Young's Motion for Preliminary Evidentiary Hearing (Doc. 110–1).

## PROCEDURAL HISTORY

Plaintiff, Jack G. Larsen, filed this Complaint on November 30, 2000. Plaintiff has been appointed to serve as Receiver for three Arizona Trusts (Southwest Income Trust, Advantage Trust, and Investors Trading Trust) and represents some 150 beneficiaries, principally Arizona residents, who invested in these trusts.

Jurisdiction is based on 18 U.S.C. § 1965(a), as it is alleged that defendants directly or through their agents and co-conspirators transacted the affairs of the conspiracy in this District. Plaintiff named Lauriel Investments, Charles Smith, Standard Industrial Capital, Glen Roger Thompson, Progressive Growth Management, Richard N. Kubany, Paul W. Floyd, III, James Floyd, Philip C. Galanis, Paul F. Clarke, and, Ernst & Young Caribbean Region Ltd as defendants.[2]

An Amended Complaint was filed on April 19, 2001. It alleged: Count I—violation of 18 U.S.C. § 1962(a); Count II—violation of 18 U.S.C. § 1962(b); Count III—violation of 18 U.S.C. § 1962(c); Count IV—conspiracy to violate 18 U.S.C. § 1962(a) in violation of 18 U.S.C. § 1962(d); Count V—conspiracy to violate 18 U.S.C. § 1962(b) in violation of 18 U.S.C. § 1962(d); Count VI—conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d). Plaintiff claims compensatory damages in the amount of $9,951,365.00 and treble damages in an amount no less than $29,845,00.95.

Oral arguments took place on August 20, 2001, with respect to the Floyds', Ernst & Young, Clarke and Galanis' Motions to

---

**1.** This Court notes that no attorney has entered an appearance on behalf of Standard Industrial Capital and that Glen Roger Thompson, acting *pro se,* filed the Motion to Dismiss on behalf of himself and Standard Industrial Capital. Mr. Thompson may not represent Standard Industrial Capital, a corporate defendant. The law is well established that a corporation must be represented by a member of the bar. *See Rowland v. California Men's Colony,* 506 U.S. 194, 113 S.Ct. 716, 721, 121 L.Ed.2d 656 (1993). This Court strongly urges that Standard Industrial Capital seek proper legal representation. Accordingly, this Court will construe the Motion to Dismiss filed by Thompson as seeking dismissal as to Thompson only, not Standard Industrial Capital.

**2.** Not all of the defendants have filed Motions to Dismiss.

Dismiss. At that time the Court took the Motions under advisement.

### FACTUAL BACKGROUND [3]

During the spring and summer of 1995, defendants Paul Floyd and James Floyd began promoting an investment program involving "prime bank guarantees." This investment program became known as Passport Club International, which was to be administered by defendant Ernst & Young in the Commonwealth of the Bahamas.

Paul Floyd and James Floyd conducted and participated in a series of meetings in Las Vegas, Nevada, and Nassau, Bahamas, at which the prospective sellers of units in Passport Club International were recruited, including third party Shoop.

Defendant Galanis made presentations to prospective sellers at certain of these meetings on behalf of defendant Ernst & Young. Plaintiff alleges that during at least one of these meetings, defendant Galanis, on behalf of Ernst & Young stressed the importance that all participants and prospective sellers of units in the Passport Club International keep all aspects of the investment confidential. The purported reason for confidentiality was vital "because interference by U.S. government regulatory agencies would jeopardize, if not destroy, the prospects of the investment program going forward."

The plaintiff further alleges that defendant Clarke on behalf of Ernst & Young actively participated in marketing efforts for Passport Club International, including the drafting and editing of a promotional brochure. This brochure was edited and prepared by third party Shoop through the use of telefacsimile transmissions between Shoop's Arizona offices and Ernst & Young's Bahamas offices.

Allegedly, during the summer of 1995, third party Shoop raised from a series of investors who were principally Arizona residents $3.3 million for investment in Passport Club International. On or about August 7, 1995, the funds were transmitted by wire transfer from bank accounts controlled by Shoop at Norwest Bank in Phoenix, Arizona, to bank accounts controlled by defendant Ernst & Young, in Nassau, Bahamas, allegedly at the direction of Paul Floyd.

After the $3.3 million was received by defendant Ernst & Young, defendant Galanis canceled the Passport Club International investment program by correspondence dated August 31, 1995, claiming that the information regarding the program and Ernst & Young's participation had been circulated prematurely in the United States, threatening interference by United States regulators.

After cancellation of the Passport Club International investment program, defendants Paul Floyd, James Floyd and Galanis proposed an alternative investment program for the $3.3 million which had remained with Ernst & Young. The new program included investment in U.S. Treasury instruments. In this regard, the defendants placed third party Shoop in contact with defendant Kubany.

In July of 1995, defendants Galanis and Kubany incorporated defendant Progressive Growth Management in the Commonwealth of the Bahamas. Progressive was, throughout its existence, under the management and control of Ernst & Young. Progressive was purportedly formed for the purpose of concealing Ernst & Young's participation in the U.S. Treasury investment program.

---

3. The facts related in this Order are construed primarily from plaintiff's First Amended Complaint, which this Court must recognize as true for the purpose of deciding the pending motions to dismiss.

In October of 1995, defendant Kubany introduced Shoop to third party Marriot, a Los Angeles attorney, to assist in managing the proposed investment program involving the trading of U.S. Treasury instruments. The $3.3 million in funds which had been raised for the Passport Club International program were then transferred from Ernst & Young to Kern & Wooley, the Los Angeles law firm with which Marriot was associated. The funds were then deposited into the Kern & Wooley trust account. In November of 1995, the $3.3 million of funds were transmitted by wire transfer from Kern & Wooley's trust account into brokerage accounts opened at Cohig & Associates, a Denver Colorado, stock brokerage house. The funds were transferred into accounts opened at Cohig & Associates by Marriott going by the name of Ghirardello under the name of defendant Lauriel Investments.

Lauriel Investments was formed by Marriot contemporaneously with the establishment of the Cohig Investment accounts and the transference of the trust beneficiaries funds from Kern & Wooley's trust account to the accounts established at Cohig & Associates by Marriot.

In December of 1995, third party Shoop promoted the formation of Southwest Income Trust in the State of Arizona to administer the trading program in Treasury instruments. Shoop solely owned and controlled the corporation which served as trustee for Southwest Income Trust. Persons who invested in the Passport Club International program were offered interest in Southwest Income Trust, and most of the investors who had invested funds in the Passport Club International program then became investors in and beneficiaries of Southwest Income Trust.

In early 1996, Shoop caused the formation of Advantage Income Trust and Investors Trading Trust in the State of Arizona to administer additional investments in the U.S. Treasury instrument trading program. Plaintiff contends that Shoop promoted the formation of Advantage Income Trust and Investors Trading Trust through straw man trustees, and throughout their existence managed and controlled the affairs of all three trusts.

Plaintiff further claims that in addition to the $3.3 million raised by Shoop for investment in the Passport Club International program, Shoop, both individually and through "finders" raised an additional $6,651,365.00 through utilizing private offering memoranda prepared for investment in Southwest Income Trust, Advantage Income Trust and Investors Trading Trust. Plaintiff asserts that $9,951,365.00 in total, was raised beginning in the fall of 1995 and ending in July 1996.

On dates including January 9, 1996, the three Trusts entered into agreements with defendant Lauriel Investments, acting through its president, Marriot with the knowledge and acquiescence of defendant Progressive Growth Management, Kubany, Galanis, and Ernst & Young. Under these agreements Lauriel Investments agreed to direct and account for trading of investments on behalf of the three trusts.

On November 13, 1995, and January 18, 1996, defendant Lauriel Investments entered into written joint venture agreements with defendant Standard Industrial Capital, which acted through its president, defendant Thompson. Pursuant to the joint venture agreements, Standard Industrial Capital agreed to conduct the trading of investment accounts on behalf of the three Trusts. The joint venture agreements recited that substantial payments, described as brokerage fees, would be paid to defendant Progressive Growth Management from profits generated by trading of the Trusts' investment accounts in accor-

dance with the terms of the joint venture agreements.

A pro forma was attached to the joint venture agreements between defendant Lauriel Investments and defendant Standard Industrial Capital. The pro forma described "highly speculative trading transactions including the leveraged purchase of options on U.S. Treasury instruments which could not realistically be consummated in the securities marketplace during 1995 and 1996."

Beginning in November of 1995 and ending in December of 1996, defendants Lauriel Investments, Standard Industrial Capital, and Thompson directed trading in the Lauriel Investments accounts maintained for the Trusts' benefit. According to the First Amended Complaint, this trading resulted in losses of principal sums invested in the Trusts by their beneficiaries in an amount not less than $3,649,483.59. Plaintiff contends that the losses were comprised of trading losses, commissions and interest charges and that the trading utilized in the accounts violated the authorization of the private offering memoranda for the three Trusts.

Moreover, beginning in summer of 1995 and ending in December of 1996, the defendants transferred an amount no less than $3,304,504.00 million of the principal sums invested by the Trusts' beneficiaries from brokerage accounts maintained for the benefit of the trusts to bank accounts in the Bahamas maintained by defendant Progressive Growth Management. Plaintiff alleges that defendant Progressive Growth Management, acting under the direction and control of defendants Kubany, Galanis, Clarke, and Ernst & Young, in turn transferred these funds to a number of bank accounts in the United States, the United Kingdom and the Bahamas for the benefit of all defendants.

Plaintiff contends that all such transfers of the funds were in express violation of the Trusts' terms of the private offering memoranda for the three Trusts, which required, among other things, that principal sums contributed by the beneficiaries be invested exclusively in U.S. Treasury instruments. The fund transfers further violated the terms of the contract which defendant Lauriel Investments and defendant Standard Industrial Capital had entered into for the benefit of the Trusts.

The defendants then transmitted monthly payments to the Trust beneficiaries which were denominated as interest payments from profits generated on trading of U.S. Treasury instruments when, plaintiff asserts, such payments were in fact generated by invading the principal sums which had been invested by the beneficiaries. Additionally, the plaintiff maintains that the payments were made with the "intent to conceal persistent and substantial losses" of the principal sums which had been invested by the Trust beneficiaries and to allow defendants to continue to transfer funds from the Trusts' brokerage accounts to bank accounts maintained for the benefit of all the defendants.

Plaintiff argues that defendants deposited correspondence and checks in the United States Postal Service, used wire communications in interstate and foreign commerce for the purpose of executing "their scheme and artifice to defraud the Trusts and their beneficiaries," and transferred funds from the United States to bank accounts maintained by defendant Progressive Growth Management in the Bahamas with "an intent to promote mail fraud."

## DISCUSSION

### Motions to Dismiss—failure to state claim

#### A. *Standard of review*

In analyzing a motion to dismiss for failure to state a claim upon which relief

may be granted, all allegations of material fact in the plaintiff's complaint are taken as true and construed in the light most favorable to the nonmoving party. *See National Wildlife Federation v. Espy*, 45 F.3d 1337, 1340 (9th Cir.1995); *see also Levine v. Diamanthuset, Inc.* 950 F.2d 1478, 1482 (9th Cir.1991).

Dismissal of an action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is "proper only where it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## B. *Failure to state a claim under RICO*

The Plaintiff charges that the defendants have violated the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. § 1962(a)-(d). Section 1962 states in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal. . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of

any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section.

Defendants Ernst & Young, Paul Clarke, Philip Galanis, Paul Floyd, James Floyd and, Glen Thompson all essentially argue that plaintiff has failed to state claim under RICO for the following reasons: (1) RICO requires multiple schemes to plead a "pattern" and this litigation is an isolated event; (2) these defendants did not commit predicate acts; (3) the First Amended Complaint fails to adequately allege continuity of the predicate acts; (4) the First Amended Complaint fails to adequately plead a RICO "enterprise"; (5) that these defendants did not have the requisite control over the enterprise; (6) these defendants' acts did not cause any injury to the plaintiff; (7) plaintiff lacks standing to bring this action; and (8) the conspiracy causes of action necessarily fail because of plaintiff's failure to adequately plead the RICO claim. Each of these issues will be addressed separately below.[4]

### *(1) The "pattern" requirement*

■ The statute's "definition" of "pattern of racketeering activity" contained in

---

**4.** This Court recognizes that some of the defendants have raised two or three of the aforementioned issues while other have raised all of them, in their Motions to Dismiss. However, in the interest of judicial economy and because many of the issues overlap, each defendant's arguments will be separately addressed only as needed.

18 U.S.C. § 1961(5), unfortunately provides little guidance to this Court. It provides that a "pattern of racketeering activity requires at least two acts of racketeering activity, one which occurred after the effective date of this chapter and the last one of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

The key word is "requires." Section 1961(5) does *not* define the term "pattern"; it merely states the necessary but not sufficient elements of a pattern: (1) two acts of racketeering activity, (2) occurring within ten years of each other.

Accordingly, the Supreme Court, when it addressed the pattern question in *dicta* in *Sedima, S.P.R.L. v. Imex Co.*, stated,

> [T]he definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern 'requires at least two acts of racketeering activity,' . . . not that it 'means' two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.'

Likewise, when the Court revisited the issue in *H.J. Inc v. Northwestern Bell Telephone Co.*, it found that § 1961(5) concerns only the minimum number of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved. 492 U.S. 229, 233, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (emphasis in original).

In this case, plaintiff alleges mail and wire fraud as the defendants' predicate acts. The Supreme Court has explained that the "pattern" requirement can be met by showing (1) "that the racketeering predicates are related," and (2) that the predicates "amount to or pose a threat of continued activity." *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. 2893.

Early on, the Ninth Circuit recognized that the Circuits were in conflict over what constituted a pattern. One group of courts, including the Eighth Circuit, has held that a series of predicate acts related to one fraudulent scheme or criminal episode does *not* constitute a pattern. *See Fulmer*, 785 F.2d at 257 (emphasis added). Another group, including the Seventh and Eleventh Circuits, has held that a series of predicate acts related to one fraudulent scheme or criminal episode can constitute a pattern as long as the predicate acts are "continuous." *See Bank of America v. Touche Ross*, 782 F.2d at 971. In addressing these conflicting positions, the Ninth Circuit agreed with the Seventh and Eleventh Circuits that it was *not* necessary to show more than one fraudulent scheme or criminal episode to establish a pattern under *Sedima*. *See Sun Savings & Loan v. Dierdorff*, 825 F.2d 187, 193 (9th Cir.1987). The Court further reasoned that "[w]e see no sound basis for the view taken by some courts that a pattern requires more than one 'fraudulent scheme' or 'criminal episode'." *See id.*

Subsequently, in *Durning v. Citibank*, the district court determined that the defendants had performed numerous predicate acts of mail and wire fraud in connection with their initial dissemination of an Official Statement, but the acts did not establish a pattern. 990 F.2d 1133, 1139 (9th Cir.1993). The Ninth Circuit affirmed the district Court holding, "[w]hile defendants may have committed numerous related predicate acts, all of those acts arose from a single isolated event: the distribution of the misleading Official Statement." *Id.*

*Durning* is distinguishable from this case. In *Durning*, the purchaser of municipal bonds argued the pattern require-

ment was satisfied because numerous copies of one particular bond prospectus had been mailed to various investors. Plaintiff argued that each mailing of the same bond prospectus represented repeated acts of mail fraud. The *Durning* Court never held that the pattern requirement could *only* be satisfied by proof of multiple criminal schemes. Instead the Court determined that the particular facts presented were insufficient to fulfill the pattern requirement.

Nonetheless, the 1989 Supreme Court holding in *H.J. Inc v. Northwestern Bell Tel Co.*, rejected the requirement that multiple schemes be demonstrated to prove a pattern of racketeering activity.

> But although proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is impossible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes.

492 U.S. at 239, 109 S.Ct. 2893. (emphasis added).

In the matter before this Court, the defendants generally argue that the First Amended Complaint describes a single fraud scheme, through evolving means, but at all times with the limited purpose of benefitting a few individuals. Defendants contend that a RICO pattern must entail "a series of multiple frauds tied together by related endeavors, perpetrators, controlling parties and victims—all connected in such a way that the enterprise poses a threat to continue its criminal activity."

Paul Floyd and James Floyd argue that plaintiff's RICO claims against the Floyds are limited to thirteen alleged acts of mail and wire fraud occurring between June 14, and September 1, 1995.

Similarly, defendant Clarke argues that his involvement in several dozen mails or wires listed in the First Amended Complaint was minimal. Clarke acknowledges two letters to Shoop, dated June 15, 1995 and August 9, 1995, and one facsimile to a Lennox Patton on October 2, 1996. The Ernst & Young transmissions took place in July of 1995 in a letter to defendant Kubany and Progressive Growth Management, one facsimile to Shoop in January of 1996, three letters to Marriot in August, September, and October 1996 and one October 1996 letter to a Bill Godly.

Defendant Galanis served as an officer of Progressive Growth Management, its President, while still employed at Ernst & Young. On July 25, 1995, he signed a written management agreement on behalf of Ernst & Young in which Ernst & Young agreed to conduct all business affairs of Progressive Growth Management, including management of its bank accounts.

Accordingly, *H.J. Inc.* allows this Court to consider the one "scheme" with multiple criminal offenses as sufficient to establish a pattern.

### (2) Predicate Acts

■ Mail fraud, along with its companion wire fraud statute, are widely used RICO predicate offenses. Section 1961(1) of the RICO statute states that "racketeering activity" includes "any act which is indictable under any of the following provisions of Title 18, United States Code:..section 1341 (relating to mail fraud) and section 1343 (relating to wire fraud....)" 18 U.S.C. § 1961(1). Violations of the mail fraud and wire fraud statutes may form the basis for RICO predicate acts under §§ 1962(a)-(d).

■ Courts often speak of 18 U.S.C. § 1341 mail fraud as requiring two elements, (1) a scheme or artifice to defraud; and (2) use of the United States mail in furtherance of the scheme. *See United States v. Green*, 745 F.2d 1205, 1207–08 (9th Cir.1984). In realty, a third element

must also be proven, (3) that the defendant acted with the specific intent to defraud. *See United States v. Bonanno,* 852 F.2d 434, 440 (9th Cir.1988).

The same elements that must be proved under the wire fraud statute are virtually identical to the elements of mail fraud. *See Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (the mail and wire fraud statutes share the same language in relevant part, and accordingly the Court applies the same analysis to both sets of offenses).

■ The plaintiff need not show that each individual defendant personally used the mail or wire services, but only that he caused the mail or wire service to be used by acting with the knowledge that their use would "follow in the ordinary course of business, or where such use could reasonably be foreseen." *American Automotive Accessories v. Fishman,* 175 F.3d 534, 542 (7th Cir.1998).

■ The crux of the defendants' argument is that allegations of mail and wire fraud are inadequate because Clarke used the mail only a few times. Thus, Ernst & Young focuses on the personal mailings of Clarke, but ignores the precedent set forth above. Namely, that each individual defendant need not use the mail for the fraud, but rather that each defendant could reasonably foresee that the mail or wires be used to further the activities alleged.

They also argue that plaintiff did not adequately demonstrate, in the First Amended Complaint, that the defendants had the requisite intent to defraud. The First Amended Complaint does make an adequate *prima facie* allegation of such intent. Whether or not the defendants intent was actually formed is a question of fact for the jury. This Court is merely concerned with whether the First Amended Complaint make a prima facie showing.

In this case, Clarke, Galanis, Ernst & Young and Progressive Growth Management used the mail and interstate wires repeatedly in furtherance of the activities described in the First Amended Complaint. The First Amended Complaint identifies approximately seventy instances where the aforementioned defendants sent, received letters, telefaxes or wire transfers. This Court recognizes that the majority of the instances, do not involve Ernst & Young. However, the number of time the mail or wires are used by any particular defendant is irrelevant to this Court's analysis. All that need be pled is that the defendants (not any one defendant in particular) knew or should have reasonably known that the activities complained of would use the mail or wires in furtherance of the activity.

Moreover, Ernst & Young fail to acknowledge that they are legally responsible for the conduct of its employees under the legal theory of *respondeat superior.* The Ninth Circuit has recognized that an employer that is benefitted by its employee or agent's violations of § 1962(c) may be held liable under the doctrines of *respondeat superior* and agency when the employer is distinct from the enterprise. *See Brady v. Dairy Fresh Prods. Co,* 974 F.2d 1149, 1154–55(9th Cir.1992).

■ With respect to the Floyds, they claim that the thirteen acts of alleged mail and wire fraud should not be considered predicate acts for RICO purposes because they were too close in time to constitute long-term criminal activity. The Floyds further argue that seven of the wire transfers of funds between December of 1995 and August of 1996 cannot be taken into account as predicate acts because they are unrelated to the alleged acts of mail and wire fraud.

The First Amended Complaint alleges that the Floyds fraudulently induced inves-

tors to commit $3.3 million to the Passport Club International prime bank guarantee program through a series of mail and wire communications in 1995, then re-channeled the funds into U.S. Treasury instruments. In conducting these activities, the Floyds were paid approximately $412,000.00 of the proceeds for their participation. Clearly, these acts were all related and plaintiff has sufficiently alleged in the First Amended Complaint that the acts relate to the same participants, same victims, and the same "scheme."

■ Defendant Thompson also seeks dismissal on this basis. The First Amended Complaint sufficiently alleges that Thompson engaged in trading which was expressly prohibited by the joint venture agreement retaining Thompson's services. Nonetheless, despite substantial sums of money lost, sums of money were transferred to Progressive Growth Management accounts in the Bahamas, although the joint venture agreement only allowed for payment to Progressive to be made on profits. Standard Industrial Capital, run by Thompson, was the direct beneficiary of the money diverted to Progressive Growth Management.

### (3) Continuity of the acts

■ In *H.J. Inc. v. Northwestern Bell Tele Co.*, the Supreme Court announced the "relationship and continuity" test with regard to proof of a pattern of racketeering activity. "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of *continued criminal activity*." 492 U.S. at 239, 109 S.Ct. 2893 (emphasis added).

■ The Court further discussed that "continuity" is both a closed-ended and an open-ended concept, referring either to a specific period of repeated con-

duct or to past conduct which threatens repetition in the future. *See id.* at 241–242, 109 S.Ct. 2893. Closed-ended continuity may be demonstrated by "proving a series of related predicates extending over a substantial period of time." *See id* at 242, 109 S.Ct. 2893. On the other hand, open-ended continuity may be established "if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *Id.*

All of the moving defendants allege that the time span of the "scheme" was too short to constitute threatened continued behavior. This argument is not well founded.

The Ninth Circuit has held that predicate acts extending over a short duration may satisfy the continuity requirement where there is a threat of continued activity. *See Ikuno v. Yip*, 912 F.2d at 308 (open-ended continuity requirements satisfied by two false annual reports in a 12 month span); *see also Sun Savings & Loan*, 825 F.2d at 194 (four predicate acts over a two-month period satisfied the continuity requirement based on the threat of continued activity). In fact, the Ninth Circuit has held that a "bright line, one-year rule undermines *H.J. Inc.'s* principle that flexibility rather than rigidity should govern the application of RICO." *Allwaste, Inc. v. Hecht*, 65 F.3d at 1528 (complaint alleging predicate acts over a thirteen-month period satisfied the continuity requirement).

In this matter, the First Amended Complaint alleges numerous predicate acts which extended for nearly two years and involved approximately fifteen participants. There were about 150 people who invested in three separate trusts and the participants used the mail and wires to facilitate their actions.

■ Moreover, the First Amended Complaint alleges that the defendants wrongdoing only terminated when the Securities Exchange Commission (SEC) froze the brokerage accounts that were funding the activity. "The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict." *U.S. v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991). Here, the SEC closed down the ongoing activity which, could have continued into the future.

### (4) Pleading a RICO "enterprise" / Control of enterprise

■ RICO's prohibitions involve the use of a pattern of racketeering activity in specified ways to affect an enterprise. As with the term "pattern of racketeering activity" the term "enterprise" is never actually defined in the statute. Instead, § 1961(4) provides a range of examples included within the concept:

> "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

■ The key word is "includes." It means that the "definition" is exemplary, not limiting. The definition of enterprise is extremely broad, and the Supreme Court has on at least two occasion commented on its broad scope. *See Russello v. United States*, 464 U.S. 16, 21–22, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *see also United State v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

In 1996, the Ninth Circuit held that a racketeering enterprise must exhibit "some sort of structure...for the making of decisions, whether it be hierarchal or consensual, and that the structure should provide some sort of mechanism for controlling and directing the affairs of the group on an ongoing rather than *ad hoc* basis." *Chang v. Chen*, 80 F.3d 1293, 1299 (9th Cir.1996).

■ Galanis, Ernst & Young, Clarke and the Floyds unpersuasively argue that neither of them had "control" of the alleged enterprise. This argument is without merit as it is not necessary for each individual to show control over the enterprise, but rather that the defendants participated in the operation or the management of the enterprise itself. *See Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

The First Amended Complaint in this matter identifies four entities that formed this enterprise; three corporations and one partnership.[5] In fact, the three corporations, Lauriel Investments, Standard Industrial Capital, and Progressive Growth Management were incorporated for the sole purpose of participating in the activities alleged in the First Amended Complaint. These entities were intricately intertwined and the outstanding stock in Lauriel Investments was owned equally by Standard Industrial Capital and Progressive Growth Management while being managed by Ernst & Young. Moreover, Lauriel Investments entered into written joint venture agreements with Standard Industrial Capital to manage the trading of the Trusts' brokerage accounts. These agreements included provisions requiring the payment of brokerage fees to Progressive Growth Management. Ernst & Young had a written contract to conduct all of the business affairs of Progressive Growth Management. All of the individual defendants, with the exception of the Floyds, presently moving for dismissal

---

5. The three corporations are Lauriel Investments, Standard Capital Investments and Progressive Growth Management. Ernst & Young is a Bahamian partnership.

were officers acting on behalf of the aforementioned entities.

With respect to the Floyds, it is alleged that they were instrumental in organizing and maintaining the fund-raising in Arizona.

Clearly, based on the allegations set forth in the plaintiff's First Amended Complaint, coupled with the broad interpretation this Court must give to the term "enterprise", neither the individual defendants nor Ernst & Young can be dismissed on this basis.

### (5) Causation

■ In order to recover damages under RICO, plaintiff is required to establish that the defendants' racketeering violations proximately caused injury to plaintiff. *See Holmes v. Securities Investor Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

■ Defendant Ernst & Young argues that it caused no damage to the Trusts based on their withdrawal after the Passport Club International failed. This claim is inconsistent with the allegations set forth in the First Amended Complaint. It is alleged that Ernst & Young participated in the Treasury investment in that they assisted in the formation and management of Progressive Growth Management. In fact, Galanis, a partner with Ernst & Young, acted as president of Progressive Growth Management. The fact that Ernst & Young argues facts to the contrary solidifies this Court's position that the defendants are asking this Court to weigh conflicting evidence and make a determination of fact. That is an inappropriate undertaking for this Court on a motion to dismiss.

■ Similarly, defendants Paul Floyd and James Floyd allege their activities did not proximately cause any injuries to the beneficiaries. This argument is also without merit. The First Amended Complaint makes a *prima facie* showing that the Floyds were instrumental in raising the initial $3.3 million in conjunction with the initial Passport Club International prime bank guarantee and, when that failed, they participated in arranging for the funds to be invested in the Treasury instrument investment. Clearly, this conduct was instrumental in proximately causing injury to plaintiff.

### (6) Standing

■ Section 1962(a) focuses on the use or investment of income derived from a pattern of racketeering activity in an enterprise. 18 U.S.C. § 1962(a). On the other hand, § 1962(b) focuses on the acquisition or maintenance of an interest in an enterprise through a pattern of racketeering activity. Each of these sections, then, renders racketeering activity in violation of the statute only if the consequences of the racketeering activity are specified.

Specifically, § 1962(a) by its terms prohibit the investment of racketeering income in an enterprise to *acquire an interest in the enterprise, to establish the enterprise, or to operate the enterprise.* (Emphasis added). The Ninth Circuit has ruled that "a plaintiff seeking civil damages for a violation of § 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income." *Nugget Hydroelectric v. Pacific Gas and Electric Co.*, 981 F.2d 429, 437 (9th Cir.1992); *see also Simon v. Value Behavioral Health*, 208 F.3d at 1083.

All of the moving defendants challenge plaintiff's standing to prosecute claims under 18 U.S.C. § 1962(a) and (b) on the grounds that the requisite damages specific to these claims have not been pled.

Plaintiff persuasively argues that the First Amended Complaint makes the *prima facie* showing of investment and acqui-

sition injury sufficient to maintain these claims. The First Amended Complaint alleges proceeds of the racketeering activity were used by the defendants to sustain their conduct until the SEC froze the brokerage accounts.

Defendants argue that § 1962(a) prohibits taking proceeds obtained through a pattern of racketeering *to invest those proceeds in an enterprise.* They further contend the Supreme Court in *Reeves* interpreted RICO's "subsections (a) and (b) as prohibiting the *acquisition* of an enterprise as opposed to the 'operation' of an enterprise." *Reves,* 507 U.S. at 182, 113 S.Ct. 1163.

Plaintiff's First Amended Complaint details the complex series of corporations and the partnership which served as the enterprise; that funds were converted from the Trusts' brokerage accounts periodically and were transferred offshore to Progressive Growth Management. Progressive Growth Management then in turn used some of these funds, in part, to pay the defendants for services rendered in conjunction with the operation of this enterprise, and to facilitate the continued operation of the enterprise.

The allegation set forth in the First Amended Complaint make the prima facie showing that the payment of operating expenses allowed the continued use of the defendants services to perpetuate the complained of activities.

### (7) Conspiracy

■ The RICO statute provides "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section." 18 U.S.C. § 1962(d). Liability under § 1962(d) does not require proof that each of the defendants were personally involved in the commission of predicate acts, "if the conspirators have a plan which calls for some conspirators to perpetuate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Salinas v. United States,* 522 U.S. 52, 64, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

The defendants claim that the conspiracy allegations set forth in the First Amended Complaint necessarily fail because the plaintiff failed to state a claim under RICO. This argument is without merit. For the numerous reasons set forth above, the plaintiff has, in fact, established a *prima facie* RICO claim against all moving defendants. Thus, the conspiracy claim survives.

### Ernst & Young and Clarke's Motion for Evidentiary Hearing[6]

■ In making its determination with respect to the existence of personal jurisdiction, the court has discretion to rely on written submissions or to hold a full evidentiary hearing. *See Data Disc. Inc. v. Systems Technology,* 557 F.2d 1280, 1285 (9th Cir.1977).

■ If the court chooses not to hear evidence, the party need make only a *prima facie* showing that personal jurisdiction exists. *See Rano v. Sipa Press, Inc.,* 987 F.2d 580, 587 n. 3 (9th Cir.1993) ("well established that where the district court relies solely on affidavits and discovery materials, the plaintiff need only establish a prima facie case of jurisdiction"). As with challenges to subject matter jurisdiction, the court will accept plaintiff's jurisdictional allegations as true and will resolve any factual dispute in the plaintiff's favor. 3 *Moore's Federal Practice* 3d. § 12.31[5] (2000).

■ If the court denies the motion to dismiss, the party may proceed to trial on the merits without waiving the jurisdic-

---

**6.** Only defendants Ernst & Young and Clarke filed the Motion for Evidentiary Hearing.

tional challenge. *See Stewart v. Ragland*, 934 F.2d 1033, 1036 n. 5 (9th Cir.1991) (party may proceed to trial on the merits without waiving jurisdictional challenge). If the court holds an evidentiary hearing, or if the issue is litigated at trial, the party asserting jurisdiction must demonstrate its existence by a preponderance of the evidence. 3 *Moore's Federal Practice* § 12.31[5]. In other words, the facts must show by a preponderance of the evidence that the *prima facie* case for personal jurisdiction has been made. *See Data Disc.*, 557 F.2d at 1285; *see also Metropolitan v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2nd Cir.1996).

▉ Plaintiff, Ernst & Young and Clarke essentially disagree as to whether or not this Court should undertake an evidentiary hearing resulting from conflicting affidavits provided by Shoop and Marriot as compared to defendants Galanis and Clarke.

Ernst & Young and Clarke claim that the affidavits of Shoop and Marriot contradict defendants Galanis and Clarke's affidavits relating to the "effects test" or whether the defendants were aware that their "intentionally tortious activity" would have a substantial impact in Arizona.

Plaintiff claims that "if reviewed fairly, the affidavits of Galanis and Clarke do not contradict Shoop and Marriot's affidavits on issues critical to the determination of personal jurisdiction."

The disputed fact centers on whether Galanis was informed of and knew that Shoop was raising monies from Arizona investors. Plaintiff argues that the defendants do not dispute knowing Shoop was an Arizona accountant, but that Galanis was never informed that the monies originated from Arizona investors. Plaintiff claims that, for jurisdictional purposes, it makes no difference whether Galanis intended to defraud numerous Arizona investors or one Arizona investor, as long as

he knew that his actions would impact at least one Arizona resident.

Similarly, Clarke states that he "has no specific recollection whatsoever of Mr. Shoop ever telling me that the Passport Club International funds were raised from Arizona." The plaintiff contends that Shoop does have specific recollections that such a conversation took place, and the fact that Clarke does not recall whether or not a conversation took place does not create an issue of fact requiring an evidentiary hearing or discovery.

Additionally, plaintiff also argues that the defendants are trying to attack the credibility of Shoop and Marriot. Plaintiff persuasively points out, that the credibility issue is an insufficient basis on which to order two rounds of discovery and further delay this matter.

It appears to this Court that the moving defendants acknowledge that plaintiff makes the requisite *prima facie* case to withstand a Motion to Dismiss and they seek to undo that showing or raise plaintiff's burden to preponderance of the evidence by requesting an evidentiary hearing. If the alleged factual dispute were more related areas that were unknown to the Court (for example, whether or when Galanis or Clarke lived in Arizona), then such a hearing may be relevant. However, this request seems to center on a credibility issue between Shoop and Marriot and Clarke and Galanis. A hearing to determine credibility is neither necessary nor appropriate under these circumstances.

## Motions to Dismiss—lack of personal jurisdiction

### A. *Standard of review*

▉ The party asserting personal jurisdiction has the burden of proving its existence if challenged. *See Butcher's Union Local No. 498 v. SDC Inv. Inc.*, 788

F.2d 535, 538 (9th Cir.1986). However, this burden is minimal. Plaintiff need only make a *prima facie* showing of jurisdictional facts to overcome a motion to dismiss based on personal jurisdiction. *See Fields v. Sedgwick Associated Risks,* 796 F.2d 299, 301 (9th Cir.1986).

In essence, the defendants claim that personal jurisdiction does not exist for two primary reasons. First, plaintiff did not plead jurisdiction under the Arizona long-arm statute in the Complaint, and is thus precluded from arguing it now. Second, plaintiff's only basis for personal jurisdiction over these defendants is under the RICO statutes, § 1965(b)—which only allows for nationwide service, not foreign service.

### B. *Motion to Dismiss*

To challenge the existence of jurisdiction over his or her person, a defendant may move for dismissal under Fed.R.Civ.P. 12(b)(2). Rule 12(b)(2) challenges the basis for jurisdiction over the person, rather than the method by which jurisdiction was obtained through service of process. Fed.R.Civ.P. 12(b)(2). Although Rule 12(b)(2) provides the vehicle for challenging personal jurisdiction, its existence will be determined on constitutional, statutory, and other substantive authority. 2 *Moore's Federal Practice* 3ed § 12.31[1].[7]

### 1. Arizona long-arm statute

In this matter, plaintiff claims that this Court has personal jurisdiction over the defendants based on the Arizona long-arm statute. Arizona permits the "exercise [of] personal jurisdiction over the parties, whether found inside or outside the state, to the maximum extent permitted by the Constitution of this State and the Constitution of the United States..." Ariz.R.Civ.P. 4.2(a).

The parties agree that personal jurisdiction over a defendant under the Arizona long-arm statute exists when: (1) the non-resident defendants purposefully directed their activities toward Arizona thereby availing themselves of the privilege of conducting activities in Arizona, also known as the minimum contacts test; (2) the claim arises out of or relates to the defendant's forum related activities; and (3) the exercise of jurisdiction comports with traditional notions of fair play. *See Lake v. Lake,* 817 F.2d 1416 (9th Cir.1987).

### (a) *Purposeful Availment*

To determine purposeful availment, a court must "determine whether sufficient minimum contacts exist; it is not the number of contacts, but the importance of the particular activities, which is persuasive." *Meyers v. Hamilton Corp.,* 143 Ariz. 249, 693 P.2d 904 (Ariz.1984). "So long as it creates a 'substantial connection' with the forum, even a single act can support, jurisdiction." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 85 L.Ed.2d 528.

Defendants Clarke and Galanis were instrumental in organizing the operation of this enterprise. The First Amended Complaint alleges that they worked closely with Shoop to set up and market the pro-

---

7. The Court notes that defendants Ernst & Young, Clarke and Galanis, have filed as "specially" appearing defendants. Formerly, the failure to appear "specially" for the purpose of objecting to personal jurisdiction waived the right to be sued in the proper federal court. *See Harrison v. Prather,* 404 F.2d 267, 272 (5th Cir.1968). The Federal Rules of Civil Procedure abolished the technical distinction between general and special appearances. *See SEC v. Wencke,* 783 F.2d 829, 832 n. 3 (9th Cir.1986). Now, in all federal courts, including those exercising diversity jurisdiction, the principal method for attacking the court's jurisdiction over the person of a defendant is Rule 12(b)(2).

gram. They corresponded with Shoop, in Arizona several times. They provided Shoop with the Agency Agreement Ernst & Young was entering into with Shoop's Arizona Corporation, Passport Club International and Progressive Growth Management.

Moreover, Ernst & Young was actively doing business in Arizona through its agreement to manage the funds of an Arizona Corporation, and by entering into a contract with an Arizona Corporation to provide management services. The parties supply conflicting affidavits in support of their Motions to Dismiss for lack of personal jurisdiction. Defendants provide affidavits from Galanis and Clarke which state that they had no knowledge that the monies came from Arizona residents. On the other hand, plaintiff supplies affidavits from Shoop and Marriot which indicate otherwise.

Specifically, Shoop's affidavit states, "Both Galanis and Clarke encouraged me to raise monies from Arizona residents for investment with Ernst & Young." (Shoop Affidavit p. 3 ¶ 8). Galanis and Clarke generally deny any such knowledge and do not recall having conversations about rasing money from Arizona residents. This Court cannot undertake a factual determination as to which affiant provides more credibility to their respective parties position, and as stated above, an evidentiary hearing to determine credibility is not appropriate. Credibility is a factual undertaking for the jury. Moreover, matters of personal jurisdiction may be reserved for trial.

### (b) Forum related activities

In addition, plaintiff must show that the litigation arises out of or is related to the defendants forum related activities. *Lake,* 817 F.2d at 1421.

Defendant Clarke argues that his contacts with Passport Club are not related to the alleged conspiracy because he withdrew before the investors were defrauded. However, the Passport Club International was only the first step. The money used to fund the Passport Club International was rolled over into a U.S. treasury trading program, which was managed by Progressive Growth Management, and its manager Ernst & Young through Clarke and Galanis.

### (c) Reasonableness

Reasonableness must also be considered in determining personal jurisdiction. *Lake,* 817 F.2d at 1422.

Plaintiff alleges that most of the 150 victims are located in Arizona, thus, Arizona has a considerable interest in providing a remedy and hearing this action. Moreover, while the Bahamas may provide for an alternative jurisdiction for Clarke, Ernst & Young and Galanis, there are numerous other defendants that are not subject to jurisdiction in the Bahamas.

### (d) Effects test

In addition to the traditional contacts analysis, a defendant will be subject to personal jurisdiction, when the defendant commits an intentional tort, where the defendant knew or had reason to know that the conduct will have a significant effect in the forum. *See Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

Defendants rely heavily on this Court's decision in *Karsten Manufacturing v. United States Golf Ass'n* for the proposition that plaintiff's allegations do not survive the effects test. *See* 728 F.Supp. 1429. In *Karsten,* this Court distinguished between intentional activity targeted at the forum state, and intentional activity that merely causes injury in the forum state. *See Karsten,* 728 F.Supp. at 1433.

Again, the defendants are asking this Court to make an improper determination of fact. As this Court has repeatedly discussed above, the plaintiff has made a *prima facie* showing that the defendants knew they were defrauding Arizona residents. Whether they actually intended to or not, is not for this Court to decide. That is a question for the jury. This Court need only concern itself with whether plaintiff has made a *prima facie* showing that the intent was present, and plaintiff has done so.

The affidavits provided by Shoop and Marriot clearly indicate that the defendants knew or should have known their actions would have an effect on Arizona residents. Shoop indicates that both Galanis, and Clarke (both who were employees of Ernst & Young) had discussions regarding where and how the money was to be raised. This Court readily acknowledges the credibility issues related to the affidavits of Shoop and Marriot. However, it is this Court's obligation to construe matters in a light most favorable to the non-moving party. Where the affidavits conflict, this Court must exercise caution and construe the evidence in favor of the plaintiff. Moreover, as also indicated above, construing any evidence in this matter—determining credibility—is a fact question for a jury, not this Court.

Accordingly, for the purpose of evaluating the defendants knowledge of the effects of their actions on Arizona, this Court is persuaded by the allegations in the First Amended Complaint and affidavits of Shoop and Marriot that the defendants knew or reasonably should have known that their actions would have had an effect on Arizona residents. Based on the allegations set forth in the First Amended Complaint and the relevant motions before this Court, this Court determines that the elements of Arizona's long-arm statute have been satisfied.

## 2. RICO Personal jurisdiction

■ Plaintiff relies on 18 U.S.C. § 1965(b) and Fed.R.Civ.P. 4(k)(2) for personal jurisdiction. Section 1965(b) provides for nationwide service of process: "[i]n any action under section 1964…in any district Court of the United States in which it is shown that the ends of justice require that to the parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district in the United States…."

Federal Rule of Civil Procedure provides 4(k)(2) as an "alternative basis for the assertion of personal jurisdiction"

Rule 4(k)(2) provides:

If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not the subject to the jurisdiction of the courts of general jurisdiction of any state.

■ There are four necessary requirements for application of Rule 4(k)(2). They are: (1) the plaintiff's claims must be based on federal law; (2) no state court could exercise jurisdiction over the defendant; (3) the exercise of jurisdiction must be consistent with the laws of the United States; and (4) the exercise of jurisdiction must be consistent with the Constitution.

Clearly, the detailed allegations in the First Amended Complaint satisfy the elements of 4(k)(2) jurisdiction. First, there is no dispute that the RICO claims alleged by plaintiff are based on federal law. Second, the defendants who assert this argument, lack of personal jurisdiction, are residents of the Bahamas or, in the case of

Ernst & Young, a Bahamian partnership. Therefore they are not subject to jurisdiction in another state. Also, the exercise of jurisdiction must be consistent with the laws of the United States and the Constitution. *See Central States,* 230 F.3d at 941. These last elements require that, in exercising jurisdiction this Court must comply with notions of fundamental fairness in keeping with the Constitution. This Order already details the defendants contact with the State of Arizona and other states in the United States which permits this Court to exercise jurisdiction in keeping with the notions of due process.

**Venue**

 Section 1965(b) requires the district court to "exercise its discretion and bring parties before the Court that would not otherwise be subject to venue in the district." Additionally, § 1965(b) allows for nationwide service of process in a RICO claim.

Defendant Thompson claims Arizona is an improper venue for this litigation, and thus the matter should be dismissed. He is the only defendant, thus far, to make such a claim.

Thompson argues that he has never been in Arizona, he is a resident of North Carolina, charged with being a principal in a Colorado Corporation (Standard Industrial Capital) and is charged with becoming involved in matter with Lauriel Investments (a Nevada Corporation).

However, plaintiff correctly argues that venue is proper under § 1965(b) because it permits nationwide service on such claims. Moreover, a significant portion of the activity making up the claims alleged in the Complaint arose in Arizona. Most of the money was allegedly taken from Arizona residents and the "profit distributions" were mailed or wired from Arizona.

**Galanis, Ernst & Young's, and Clarke's Motion for Protective Orders; Plaintiff's Motion to Compel**

On March 21, 2001, Galanis, Ernst & Young, and Clarke filed Motions for Protective Orders asserting that they should not be required to respond to Request for Admissions and Non–Uniform Interrogatories served by the plaintiff. They requested that this Court issue an Order of Protection until the pending Motions to Dismiss, based on lack of personal jurisdiction, were decided. Plaintiff opposed the motions and requested this Court to compel the requested discovery and issue sanctions.

Obviously, this Order details the reasons that this Court has determined personal jurisdiction over the moving defendants exists. Accordingly, the requested Orders of Protection are moot.

Similarly, the parties stipulation of July 5, 2001, agreeing to limited discovery on the issue of personal jurisdiction appears to moot the Motion to Compel.

With the nature and extent of the issues alleged, coupled with witnesses and defendants scattered far and wide, this Court anticipates that discovery disputes will continue to arise. In this light, please take note of this Court's policy governing discovery disputes. The parties are instructed to contact the Court when a discovery dispute arises, whether it be written discovery or a deposition. If the Court is available, it will take the call and attempt to informally resolve the matter without the need to file written motions. Written motions clearly delay the resolution of the dispute and the litigation as a whole. Essentially, this Court asks that the parties "pick up the phone before they pick up the Dictaphone." If the matter needs further briefing or the Court is otherwise unable to resolve the matter, then written motions may be appropriate.

Based on the foregoing,

IT IS ORDERED that defendant Paul Floyd and James Floyd's Motion to Dismiss (**Doc. 18–1**) is DENIED.

IT IS FURTHER ORDERED that defendant Galanis's Motion for Protective Order (**Doc. 43–1**) is DENIED as moot.

IT IS FURTHER ORDERED that defendant Thompson's Motion to Dismiss (**Doc. 61–1**) is DENIED.

IT IS FURTHER ORDERED that defendants Ernst & Young and Clarke's Motion to Dismiss for lack of personal jurisdiction (**Doc. 83–1**) is DENIED.

IT IS FURTHER ORDERED that defendant Ernst & Young and Clarke's Motion to Dismiss for failure to state a claim (**Doc. 84–1**) is DENIED.

IT IS FURTHER ORDERED that Galanis' Motion to Dismiss for lack of personal jurisdiction (**Doc. 87–1**) is DENIED.

IT IS FURTHER ORDERED that Galanis' Motion to Dismiss for failure to state a claim (**Doc. 88–1**) is DENIED.

IT IS FURTHER ORDERED that defendants Ernst & Young and Clarke's Motion for Protective Order (**Doc. 98–1**) is DENIED as moot.

IT IS FURTHER ORDERED that plaintiff's Motion to Compel and request for Sanctions (**Doc. 102–1 & 102–2**) are DENIED as moot.

IT IS FURTHER ORDERED that defendant Ernst & Young and Clarke's Motion for Evidentiary Hearing (**Doc. 110**) is DENIED.